UNITED STATES of America, Appellee,

v.

Dennis L. MITCHELL, Appellant.

UNITED STATES of America, Appellee,

v.

Paul B. CAMPBELL, a/k/a
Soup, Appellant.

Nos. 94–3003, 94–3016.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 17, 1995.

Decided March 28, 1995.

As Amended April 27, 1995.

Rehearing and Suggestion for Rehearing
In Banc Denied June 7, 1995.

Jonathan S. Zucker, appointed by this Court, argued the cause and filed the briefs, for appellant Mitchell.

Reita Pendry, Asst. Federal Public Defender, argued the cause, for appellant Campbell. With her on the briefs was A.J. Kramer, Federal Public Defender.

Timothy J. Heaphy, Asst. U.S. Atty., argued the cause, for appellee. With him on the brief were Eric H. Holder, Jr., U.S. Atty., John R. Fisher, Thomas C. Black, Sharon A. Sprague, Eileen C. Mayer (on the brief), Preston Burton and Margaret M. Lawton, Asst. U.S. Attys., entered an appearance, for appellee.

Before EDWARDS, Chief Judge, WALD and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Appellants Dennis Mitchell and Paul Campbell were convicted of conspiracy to possess and distribute cocaine in violation of 21 U.S.C. § 846. In addition, Campbell alone was charged with and found guilty of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848, based on findings of guilt in fourteen of twenty-seven drug-related violations charged as elements of this enterprise, and of distribution of drugs in the District of Columbia, in violation of 21 U.S.C. §§ 841(b)(1)(A)(iii). Both defendants were charged with forfeiture of $1 million acquired during the illegal narcotic activities pursuant to 21 U.S.C. § 853. On appeal, each defendant raises several challenges to his conviction. We find that none of these challenges has merit and affirm the

convictions. We find, however, that Mitchell has raised valid challenges to his sentence, and, accordingly, vacate his sentence and remand for resentencing.

Taken in the light most favorable to the government, the evidence presented at trial established that Campbell distributed cocaine and cocaine base to various persons in St. Louis, Missouri, Washington, D.C., and several California cities between 1985 and 1992, and that he recruited and maintained a significant number of distributors and couriers to support this operation. The evidence also established that Mitchell was involved in Campbell's operation, primarily through making non-drug deliveries connected with drug transactions, during two distinct time periods in 1990 and 1992.

## I. SUFFICIENCY OF THE EVIDENCE

■ Campbell challenges the sufficiency of the evidence to support his continuing criminal enterprise conviction. In order to convict a defendant of engaging in a continuing criminal enterprise, the government must prove beyond a reasonable doubt that he committed a series of drug violations "in concert with five or more other persons with respect to whom [the defendant] occupies a position of organizer, a supervisory position, or any other position of management." 21 U.S.C. § 848(c). Campbell argues that there was insufficient evidence that he occupied a managerial position over five other people. Instead, he argues, the evidence showed only that he "fronted" drugs to independent dealers.

When we assess claims of insufficient evidence, "[o]ur review is confined to the question 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond reasonable doubt.'" *United States v. Washington*, 12 F.3d 1128, 1136 (D.C.Cir.1994) (quoting *Jackson v. Virginia*, 443 U.S. 307 (1979) (emphasis in original)). In this case our examination of the evidence presented at trial reveals that this standard is readily met.

As Campbell observes, several courts have held that if a dealer simply sells drugs to other dealers on consignment and is paid from the proceeds of their sales, but has no other involvement in their sales, the dealer does not have the necessary managerial control for conviction of leading a continuing criminal enterprise. *See, e.g., United States v. Ward*, 37 F.3d 243, 248 (6th Cir.1994), *petition for cert. filed* (U.S. Feb. 6, 1995) (No. 94–8069); *United States v. Delgado*, 4 F.3d 780, 785–86 (9th Cir.1993); *United States v. Possick*, 849 F.2d 332, 336 (8th Cir.1988). Without ascertaining the precise line between "fronting" and "managing," we have no doubt that the evidence in this case established that Campbell actually *managed* more than five other parties in the course of his seven-year operation. Below, we highlight certain segments of the evidence that illustrate Campbell's control over at least five people. The record contains significantly more evidence than we present below; we summarize only enough to establish the requisite control over five people.

*Randy Walker.* Randy Walker testified to meeting Campbell in Sacramento and helping with the distribution of drugs roughly thirty times. Transcript ("Tr.") at 168, *United States v. Campbell and Mitchell* (D.D.C.1993) (Cr. No. 92–213). He described one incident in detail, in which Campbell took him to the Oak Park area of Sacramento, where, Campbell informed Walker, "he had several dope houses." Tr. at 154. Campbell gave Walker 15 to 20 "sixteenths of rock cocaine," told Walker the price at which he should sell them, and took Walker to "one of his rock houses." Tr. at 155. At this house, Campbell told two other men selling drugs that "nobody else in the house" was to sell "sixteenths" until Walker was done. Tr. at 155.

When Campbell subsequently moved his operations to St. Louis, Walker testified that Campbell paid him to bring drugs from Los Angeles to St. Louis. Tr. at 228. On various occasions in St. Louis, Campbell told Walker and others, including "Tony" and "Mike," to send money from drug sales via Western Union. Tr. at 250.

*Outlaw and His Cousins.* Tim Outlaw was one of Campbell's co-conspirators in St. Louis. Outlaw testified that Campbell recruited Outlaw's cousins to sell drugs by

telling them that because they were "preppie looking ... they could get by the airport and they could bring a lot of stuff in and out and they could make a lot of money with him." Tr. at 1027. After Outlaw's cousins sold a batch of drugs that Campbell had acquired, Campbell arranged for Outlaw and one of his cousins to bring the proceeds of the sale to Los Angeles and instructed them to "wear nice slacks and keep [their] hair combed right and wear nice shirts ... so [they] wouldn't be profiled, wouldn't get stopped in the airport." Tr. at 1033–34.

*Calvin Stevens in Washington, D.C.* Calvin Stevens testified to selling drugs on a consignment arrangement with Campbell. His description of the relationship established that it involved oversight of a degree sufficient to remove it from the pure "fronting" category. Specifically, Stevens testified that, "He called me practically every day. I think it amounted to maybe four or five days, just checking on my progress. I told him I was almost done." Tr. at 1374. He also testified that Campbell "wanted Sherwin and I to drive down to El Paso." Tr. at 1980.

*Drivers.* Government witness Calvin Stevens testified that Campbell had several regular drivers: "Paul said ... that the people that usually drove for him, Sherwin, the guy Kevin and P.J., they were all in Mexico with him waiting on his connection to come through." Tr. at 2008. He testified to meeting Kevin Swanberg, and that, "Paul later told me that he was one of his drivers." Tr. at 2000.

In sum, this evidence readily supports the jury's finding that Campbell did not simply "front" drugs to the various people involved in his operation. To the contrary, the evidence shows that he recruited, trained, and directed more than five workers, and thus sustains a conviction for engaging in a continuing criminal enterprise.

## II. EVIDENCE OF OTHER BAD ACTS

Both Campbell and Mitchell charge that the district court erred in admitting, pursuant to Federal Rule of Evidence 404(b), evidence of an uncharged methamphetamine deal. Campbell and Mitchell were each charged with conspiracy to possess and dis-

tribute cocaine and cocaine base. At trial, the government introduced evidence of an uncharged methamphetamine deal in which both Campbell and Mitchell were involved. Before the district court, the government pressed two grounds for the admission of the evidence: first, that it was part of the conspiracy to possess and distribute cocaine, because .Campbell used the proceeds from the methamphetamine sale to fund ongoing efforts to obtain cocaine, and second, that it was admissible as relevant "other crimes" evidence pursuant to Federal Rule of Evidence 404(b).

The trial court, relying on the government's proffer that the methamphetamine transaction was linked to the ongoing cocaine conspiracy, initially admitted the methamphetamine evidence as evidence of the conspiracy itself. After testimony from several witnesses about the transaction, however, the trial court concluded that the government had failed to establish a link between the deals, and that the evidence was not admissible as direct evidence of the conspiracy. At this point, the district judge considered the government's alternative 404(b) argument, and concluded that the evidence was admissible under 404(b). Accordingly, he instructed the jury that it could only consider the evidence for its relevance to knowledge, intent, lack of mistake, and to "illustrate the relationship and agreements between the defendants." Tr. at 4197–98. In its final directions to the jury, the district court distilled its charge to instruct that the evidence could be considered "for only two limited purposes": (1) "whether that evidence shows that the defendants had a specific plan to commit a series of crimes that are connected to each other"; or (2) "whether the defendants .intended to commit the charged. offenses." Tr. at 7875.

### A. *The Evidence Admitted*

The evidence at issue involved a methamphetamine deal arranged jointly by Campbell and Khalifeh Abujudeh. . A former co-conspirator of Campbell's, Abujudeh was, during the period of the methamphetamine transaction, acting as a government informant subsequent to his arrest. In this role, he was

instructed to arrange a drug transaction with Campbell, to make recordings of his dealings with Campbell, and to arrange that the final sale be made to a government agent. Accordingly, when Campbell "indicated he was associated with a meth lab" and asked if Abujudeh "ha[d] anybody that might be interested in buying it," Tr. at 3688–89, Abujudeh told Campbell that he would, indeed, be able to sell some methamphetamine if Campbell acquired it.

In several phone calls over the next month, Abujudeh prodded Campbell to come to San Clemente and complete this deal, telling Campbell he was broke and needed money for his attorney. Tr. at 3693 (tape of conversation in which Abujudeh says, "You know what's up. Gotta get paid, Soup [Campbell], gotta get paid. So what's the status, man?"); Tr. at 4425 (Abujudeh recalls "at several different times, either myself or Mr. Campbell brought up the ongoing story about my attorney and the fact that we were both broke at the time, and this is part of the reason that Mr. Campbell was doing the whole thing with the ephedrine and speed is he also needed money"). Subsequently, Campbell "put[ ] together an ephedrine deal with a guy by the name of Nathan Everhardt, who was in Florida." Tr. at 3822. Campbell and Abujudeh jointly wired money to Everhardt via Western Union, Tr. at 3812, and "[a]bout that time it was decided that [Everhardt] would send three boxes of ephedrine to Dennis Mitchell's house. Paul sent Dennis home to go receive the ephedrine," Tr. at 3822.

This purchase of the ephedrine was the first step in a two-step process. After Mitchell returned with the ephedrine, the two men needed to complete the second step—exchanging the ephedrine, a precursor to methamphetamine, for actual methamphetamine. Tr. at 3906. Both Abujudeh and Campbell negotiated with their own sources to consummate this second step. Campbell's source

fell through and the exchange was ultimately made with Abujudeh's source, Mike Lancelotti.[1] When less ephedrine than expected arrived, Campbell renegotiated the ephedrine-methamphetamine swap with Lancelotti. Tr. at 3907–09. Under the final deal, Campbell agreed to give Lancelotti the ephedrine in exchange for $5000 and one pound of methamphetamine. *See id.*

Mitchell then drove the ephedrine to Sacramento and made the exchange with Lancelotti. Tr. at 3910. He returned to San Clemente with the money and methamphetamine, which he gave to Campbell. Tr. at 3964. Abujudeh and Campbell then arranged to send Mitchell to sell the methamphetamine to Abujudeh's buyer, the undercover officer. *See id.* Mitchell returned with $10,000, which he gave to Campbell, who, in turn, gave $5,500 to Abujudeh. Tr. at 3980.

## B. *Rule 404(b) and the Admission of Other Bad Acts*

■ Rule 404(b) of the Federal Rules of Evidence proscribes the admission of evidence of "other crimes, wrongs, or acts" when its use is to show propensity, *i.e.*, where the jury is encouraged to make the inference that because the defendant committed *another* bad act, he is more likely to have committed the charged act. The rule permits, however, the introduction of evidence of other bad acts "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED.R.EVID. 404(b). Evidence of the other bad acts that meets this "relevancy threshold" of Rule 404(b) is not automatically admissible. It must still satisfy Rule 403, under which the court must assess whether its "probative value is substantially outweighed by the danger of unfair prejudice." FED.R.EVID. 403.

In accordance with this scheme, this court follows a two-step analysis in reviewing dis-

---

1. At oral argument, the government asserted that Campbell told Abujudeh to call the methamphetamine dealer, Mike Lancelotti. Though this is true, the government neglects to point out that Abujudeh initiated the idea of calling Lancelotti. During the course of the conversation to which the government refers, Abujudeh told Campbell

that "We should just have Dennis go up and talk to my guy [Mike Lancelotti]." Tr. at 3869. *After* he made this suggestion, Campbell "asked [Abujudeh] to page Mike up north to discuss possibly doing the deal with him." Tr. at 3870. Both Campbell and Abujudeh then discussed the terms of the deal with Lancelotti. Tr. at 3871.

trict court decisions to admit evidence of a defendant's other bad acts. *See United States v. Clarke*, 24 F.3d 257, 264 (D.C.Cir. 1994). First, we inquire whether that evidence is relevant to a material issue other than character. If so, we proceed to the second inquiry, whether the probative value is substantially outweighed by the prejudice.

### 1. *The Relevancy Threshold*

Under the first step of our inquiry, we must determine whether the evidence is "relevant to a material issue other than character." *United States v. Manner*, 887 F.2d 317, 321 (D.C.Cir.1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990). In this case, Campbell and Mitchell were both charged with conspiracy to possess and distribute narcotics. To convict a defendant of such a charge, the government must prove that he "had the specific intent to further the common unlawful objective" of the conspiracy, *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C.Cir.1988), *cert. denied,* 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 and 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143, and we have frequently upheld the admission of evidence regarding other drug transactions as relevant to intent in a charged drug transaction. *See, e.g., United States v. Washington*, 969 F.2d 1073, 1081 (D.C.Cir. 1992), *cert. denied,* 113 S.Ct. 1287 (1993); *United States v. Moore*, 732 F.2d 983, 992 (D.C.Cir.1984). Nevertheless, both Mitchell and Campbell argue, for different reasons, that the evidence of the methamphetamine transaction does not even meet the threshold relevancy requirement. We address each argument in turn.

■ Campbell argues that the methamphetamine transaction was so thoroughly orchestrated by Abujudeh, then acting as a government agent, that it is completely irrelevant to *Campbell's* intent to engage in drug trafficking. Based on our review of the evidence, we do not find Abujudeh's role to be so controlling so as to vitiate Campbell's intent in the methamphetamine deal. To the contrary, though it is apparent that Abujudeh·repeatedly encouraged Campbell to go forward with the methamphetamine deal, Campbell shared a full and willing part in the transaction. In particular, as detailed above, Campbell initiated the possibility of a methamphetamine deal, located the ephedrine supplier, arranged for money to be wired to him, and for the ephedrine to be delivered. He also sought a source for the second step—the methamphetamine exchange—and participated in negotiations with Abujudeh's source when his own source fell through. Finally, it was Campbell who exercised control over Mitchell, directing him to make the various deliveries and exchanges in the transaction. Thus, though it is undisputed that Abujudeh "enticed" Campbell to come to San Clemente to complete the methamphetamine deal, and that he did so in order to arrange a sting operation against Campbell, it is also clear that the evidence readily supports the conclusion that Campbell was a willing, intentional, and capable actor in this transaction. We are, therefore, persuaded that the transaction was not so tainted by Abujudeh's enticement to render it irrelevant to *Campbell's* intent to engage in a continuing criminal enterprise.

■ Mitchell also argues that the Rule 404(b) evidence was not relevant to *his* intent in the charged crimes because his involvement in the methamphetamine transaction was *subsequent* to much of the evidence linking him to the conspiracy and thus cannot elucidate his intent in those earlier transactions.

The evidence presented at trial regarding Mitchell's role in the conspiracy involved two discrete time periods during which Mitchell worked for Campbell. First, there was testimony that in June, 1990, Mitchell drove a truck from Washington, D.C. to El Paso with $100,000 in drug proceeds hidden in the spare tire, and that he possibly made another delivery for Campbell during this time period. Tr. at 3545–46; 3745. Second, there was testimony that in 1992, Mitchell (1) accompanied Campbell on a visit during which Campbell intended to collect a drug·debt, Tr. at 3803–06, and (2) assisted in Campbell's abortive attempts to import cocaine from Mexico by transporting false identification papers to enable a Mexican national to gain entry into the country who would then assist Campbell in obtaining cocaine and driving another indi-

vidual from Mexico to California who was to assist Campbell in the scheme, Tr. at 4037, 4113.

The government's main theory of the admissibility of the methamphetamine transaction is that it is relevant to Mitchell's intent in driving the drug proceeds to El Paso. With respect to that incident, we agree with Mitchell that, although subsequent acts may sometimes be relevant to the intent underlying an earlier act, *see United States v. Watson*, 894 F.2d 1345, 1349 (D.C.Cir.1990) (not an abuse of discretion to admit evidence of drug possession three months after charged act); *United States v. Manner*, 887 F.2d 317, 321 (D.C.Cir.1989) (not an abuse of discretion to admit evidence of drug transaction occurring ten weeks after charged act; evidence is "arguably relevant"), the two-year gap exceeds the bounds of that relevance on the facts of this case. *See United States v. Betts*, 16 F.3d 748, 759 (7th Cir.1994) (abuse of discretion to admit evidence of possession of large quantities of marijuana two years subsequent to charged act of conspiracy to distribute marijuana). Because Mitchell's role in the conspiracy did not stop in 1990, however, and because the methamphetamine transaction was contemporaneous with Mitchell's involvement in the 1992 efforts to obtain cocaine, we conclude that it *was* probative of Mitchell's intent during the later time period.

### 2. *The Rule 403 Balance*

The second inquiry, under Federal Rule of Evidence 403, is whether the probity of the methamphetamine deal was substantially outweighed by its prejudice. Each defendant also argues that the district court erred in conducting this balance. The district court's assessment of the Rule 403 balance is reviewed only for grave abuse of discretion. *Manner*, 887 F.2d at 322. As detailed above, we have concluded that the evidence was probative of both Mitchell's and Campbell's intent, and thus passes Rule 404(b)'s relevancy threshold. To carry out the Rule 403 *balance*, we must assess the *degree* of probity of the evidence, which, in turn, depends on its relation to the evidence and strategy presented at trial in general. Thus, as we have noted in the past, if intent is formally an

element of the crime, but it is nevertheless "implausible" that the charged acts could have been committed absent the requisite intent, then intent "seems a very weak ground of admission." · *United States v. Johnson*, 970 F.2d 907, 913 (D.C.Cir.1992).

#### a. *Probative Value*

*Campbell.* Upon examination of Campbell's trial strategy, we conclude that the evidence had *significant* probative value, because Campbell placed intent squarely at issue. In particular, as part of its case against Campbell, the government offered tapes of recorded · conversations in which Campbell was, seemingly, negotiating cocaine deals. In response to this evidence, Campbell testified that he did not genuinely intend to negotiate cocaine deals; he intended only to "scam" money from would-be cocaine purchasers. His sole goal, he testified, was to get money by making false promises of delivering drugs. *See, e.g.*, Tr. at 6643 ("I was . . . trying to *ploy* Mr. Stevens to send some money.") (emphasis added); Tr. at 6645 ("[I]t's just another ploy. . . . I want him to send me some money.").

In other words, according to Campbell's testimony, he had no intent actually to arrange drug deals. By so placing his intent in issue, Campbell made highly probative evidence of another drug transaction, in which his intent was evidenced by his concrete actions. Because the evidence of Campbell's role and intent in the methamphetamine transaction was so closely keyed to the issue of intent he raised by arguing that he was merely "scamming" in the cocaine tapes, it was highly probative.

*Mitchell.* Mitchell also raised intent as an issue. In his opening statement, Mitchell addressed the evidence of his 1990 involvement in the conspiracy, telling the jury that he had been an unwitting accomplice:

> Mr. Mitchell, the evidence will show, was never told that there was a substantial amount of money in that truck. Mr. Mitchell was never told where the money came from or whose money it was or what the money was for. He did what Mr. Campbell asked him to do.

Tr. at 101–02. Mitchell's opening statement made no mention of any of the 1992 acts with which he was charged. By raising an intent-based defense to the 1990 evidence against him, and failing to indicate that he would *not* challenge intent with respect to the later acts, Mitchell's opening statement can fairly be construed to raise lack of intent as a *general* defense to the charged conspiracy. Because Mitchell thus effectively raised intent as an issue in his 1992 acts, and because the methamphetamine transaction is probative of Mitchell's intent in those acts, with which it is contemporaneous, the methamphetamine transaction was highly probative of a material issue.

### b. *Prejudice*

■ The prejudice that the court must assess is the prejudice that "lies in the danger of jury misuse of the evidence." *United States v. Brown*, 490 F.2d 758, 764 (D.C.Cir. 1973). The introduction of other crimes evidence to illuminate intent carries an inherent risk of such prejudice, because the permissible inference—*e.g.*, Campbell intended to sell methamphetamine, so he likely intended to sell cocaine—is very close to the impermissible inference—Campbell sold methamphetamine, so he likely sold cocaine. *See* CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, 1 FEDERAL EVIDENCE § 112 at 648 ("[U]se of other crimes [to show intent] is troubling because it involves a kind of particularized character inference. The defendant entertained the criminal intent on a prior occasion, so on the occasion of the charged offense he likely had the same intent. Very little space separates this inferential logic from the general propensity inference the FRE 404 seeks to prevent (he did it before, so he is the sort who behaves that way and probably did it

this time).""). In this case, however, the district court took caution to guard the space between the permissible and impermissible inferences by instructing the jury to consider the evidence only for its proper purpose.[2] Based on our survey of the evidence, "we find no compelling or unique evidence of prejudice in this case," *Washington*, 969 F.2d at 1081, and, in light of the significant probative value of the evidence, detailed above, we conclude that the district court did not abuse its discretion in concluding that the Rule 403 balance militated in favor of the admission of the evidence.[3]

### III. WESTERN UNION MONEY TRANSFER RECORDS

Both Campbell and Mitchell challenge the trial court's admission of certain Western Union money transfer records ("records") under a combination of the business records and co-conspirator statement exceptions to the hearsay rule. *See* FED.R.EVID. 803(6) & 801(d)(2)(E). The district court admitted eighty-four of these records that identified as either the sender or recipient an individual connected in some way to the conspiracy. Though the district court shifted its analysis of the admissibility of these records over the course of the trial, its final analysis appears to have been that the *recipients'* names on these documents were verified and thus within the business records exception, and that the senders' names were admissible as co-conspirator statements made by the recipients in signing for the money.

Campbell objects to the admission of forty-two of the records, Mitchell to three of them bearing his name as the sender or receiver. Two additional records bearing Mitchell's

---

2. Campbell argues that even if the district court was correct in admitting evidence of the methamphetamine deal under Rule 404(b), it erred in not providing an *immediate* limiting instruction, as required by this circuit. *See United States v. Copelin*, 996 F.2d 379, 386 (D.C.Cir.1993). The court's limiting instruction in this case came immediately at the close of the testimony about the methamphetamine transaction. This instruction at the close of, rather than in the midst of, the testimony adequately satisfies this circuit's requirement of an immediate limiting instruction.

3. Mitchell also argues that the methamphetamine evidence caused a variance between the indictment and the proof because, "[r]ather than the single conspiracy charged in the indictment, the government's evidence proved an additional uncharged methamphetamine conspiracy." Mitchell Brief at 34. The methamphetamine evidence, however, was not introduced as substantive evidence of another conspiracy. It was admitted only, as detailed above, as relevant to Mitchell's and Campbell's intent in the charged conspiracy.

name as the sender were admitted along with testimony from Abujudeh that he sent the money using Mitchell's name. Mitchell does not challenge the admission of these records. We address the two defendants' claims together.

■ The business records exception to the hearsay rule authorizes the admission of records "made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." FED.R.EVID. 803(6). If the records contain information obtained from a customer, thus constituting hearsay within hearsay, the information will come within the business records exception only "if it is shown that [the business's] standard practice was to verify the information provided by [the] customer." *United States v. Patrick,* 959 F.2d 991, 1001 (D.C.Cir.1992).

■ In this case, a Western Union employee testified that under Western Union's verification procedures, the sender's identity is not verified at all. In order to *receive* funds, however, the recipient must either show identification or answer a test question given by the sender. If the transfer is for more than $500, the recipient must also match a physical description given by the sender in order to receive the funds without providing identification. The district court found that the test question and identification requirements each constituted adequate verification of the recipient's identity. We are more dubious than the district court that the test question procedure adequately verifies the actual *identity* of the recipient. It seems to prove that the recipient is the sender's *intended* recipient, not that he actually bears the name presented.

Upon examination of the Western Union records admitted, however, we conclude that any possible error was harmless. The Western Union custodian of records testified that if a test question were used, that would be indicated on the record. Tr. 922–23, 942–43, 946, 956. Of the 42 records to which Campbell objects, only five indicate that a test question was used (WU–40, WU–41, WU–61, WU–62, WU–108), and one of these further indicates that "payee must have ID" (WU–41). Thus, even if it was error to conclude that the test question procedure constituted adequate verification, it was harmless beyond a reasonable doubt, because, in the end, it involved only four of the 84 records admitted. *See United States v. Jordan,* 810 F.2d 262, 264 (D.C.Cir.1987) (because admission of hearsay implicates the Sixth Amendment's Confrontation Clause, errors must be harmless beyond a reasonable doubt).

■ Campbell also objects to the district court's basis for admitting the *senders'* names. After concluding that the recipients' names were admissible under the business records exception, the district court concluded that the senders' names were admissible as co-conspirator statements made by the recipients in the course of signing for the money. Campbell argues that there was insufficient evidence that "many" of the individuals named on the money transfer records were co-conspirators or that they were acting in furtherance of the conspiracy. Campbell Brief at 43. Campbell does not argue that this problem infected all the records to which he objects, and, with one exception, does not identify the particular records that he alleges were inadequately connected to the conspiracy.[4]

4. Campbell's only *specific* objection is to the transfers to Inez Disheaux and Nathan Everhardt, on the grounds that these transfers were in furtherance of the methamphetamine transaction and not the charged conspiracy. Given the overwhelming evidence of Campbell's role in the methamphetamine transaction, which he does not contest, any error in the admission of these records was harmless.

Campbell also argues that his family members were inadequately connected to the conspiracy and that *their* statements in receiving money were therefore not co-conspirator statements in furtherance of the conspiracy. However, the fact that family members *received* large money transfers was relevant and thus admissible, whether or not the family member was shown to be a member of the conspiracy. Thus, the "half" of the Western Union record identifying the family member as recipient was admissible as a business record and it was relevant. In all but one case (WU–86), the *other* half of the record identified someone other than Campbell as the sender (*see, e.g.,* WU–46, "Robert Smith"), and thus the

When the government presented the argument that the senders' names could be admitted as co-conspirator statements, it withdrew certain Western Union records for which it felt there was inadequate evidence that the recipient was a co-conspirator. Tr. 5815. For each of the records that it subsequently sought to admit, the government maintained that the recipient was a co-conspirator and that the statement was made in furtherance of the conspiracy. *See, e.g.,* Tr. 5821–22. The district court admitted the records on this theory, and required in each case "evidence in the record" that the recipients had "either sold drugs or received money or that Mr. Campbell directed them to send the money or Mr. Campbell directed them to receive the money." Tr. 5824. Thus, the district court required a showing of the recipient's connection to the conspiracy before admitting the record. It is always possible that the district court may have inadvertently let in a few records for which there was an inadequate showing that the recipient was a co-conspirator, receiving money in furtherance of the conspiracy, but its general approach was certainly appropriate. In the absence of more particularized objections from Campbell, we find no error.

Mitchell only objected to the admission of three of the five records bearing his name. Two of these records identified Mitchell as the recipient and showed that no test question was used, so Mitchell's name was properly admitted under the business records exception to the hearsay rule. Tr. 946 (WU–9, WU–75). On the third, Mitchell was listed as the sender, so no verification was made. Mitchell argues his name was improperly admitted because the transfer documented in this record was inadequately related to the conspiracy. Although this may be true, testimony about the records in general diminished the impact of this record sufficiently to render any error in its admission harmless. In particular, the jury had (1) testimony from Abujudeh that he used Mitchell's name to make transfers in certain instances, and (2) testimony from a handwriting expert that he could not verify that the endorsement on one of the other records was actually Mitchell's.

admission of the sender's name did him no

Thus, even if the record was improperly admitted, it did not add any significant weight to the already solid case against Mitchell. *See Jordan,* 810 F.2d at 265 (admission of hearsay harmless where, among other things, defendant was able to "attenuate" its impact by suggesting bias). Accordingly, we conclude that the admission of this Western Union record was harmless beyond a reasonable doubt. *See id.*

## IV. LIMITATION OF CROSS–EXAMINATION

■ Campbell challenges the district court's limitation of his cross-examination of Tom Pokorny, a government witness. Pokorny was a cooperating government witness who testified about multiple cocaine purchases he and Campbell made in partnership in El Paso. He also testified that he used the profits from those cocaine transactions to invest in a planeload of marijuana, and that Campbell "wanted to know if he could sell something if it actually happened." Tr. at 2620. The plane that Pokorny brought out of Guatemala was seized, and it contained cocaine rather than marijuana. Pokorny testified that he did not know that cocaine was on the plane, because he had negotiated to bring in marijuana, not cocaine. He nevertheless pleaded guilty to a charge of conspiracy to import cocaine and testified in the trial against Campbell pursuant to this plea bargain. Campbell was not connected to the plane transaction in any way, and he was not charged with it at trial.

At trial, Campbell attempted to discredit Pokorny's testimony that he only intended to import marijuana with this plane by using Drug Enforcement Agency ("DEA") videotapes of negotiations between Pokorny and an undercover agent in which Pokorny indicated that he had intended to import cocaine. The district court denied the cross-examination on the grounds that it would be cumulative and a waste of time given its "tangential[ ]" relevance. Tr. at 4494. The district court found the cross-examination to be cumulative because Campbell was able to use similar material to cross-examine Pokorny on this matter, namely, the presentence report of a third party which described the video-

harm.

taped conversation between Pokorny and the government agent and recounted Pokorny's statements that he did, in fact, intend to import cocaine. *See id.*

The district court " 'enjoys wide discretion to control cross-examination,' " and this court "will reverse the district court's decision to limit cross-examination only if it 'results in prejudice to the substantial rights of the appellant.' " *United States v. Thorne,* 997 F.2d 1504, 1513 (D.C.Cir.) (quoting *Harbor Ins. Co. v. Schnabel Found. Co.,* 946 F.2d 930, 935 (D.C.Cir.1991), *cert. denied,* 504 U.S. 931, 112 S.Ct. 1996, 118 L.Ed.2d 592 (1992)), *cert. denied,* — U.S. —, 114 S.Ct. 568, 126 L.Ed.2d 467 (1993). As Pokorny's intent to import cocaine with *this* airplane was collateral to the issues at trial—Campbell was not charged with this cocaine shipment—the district court was within its discretion in limiting this cross-examination to impeachment based on the presentence report. *See Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (" '[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' ") (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (*per curiam*) (emphasis in original)).

■ Campbell also objects to the district court's refusal to allow him to cross-examine Pokorny on the issue of racial bias. In the course of five hours of videotaped conversation between Pokorny and federal agents, there was one point at which Pokorny used a racial epithet. In response to an agent's observation that Pokorny's most recent payment had been in five- and ten-dollar bills, Pokorny said, in a dismissive fashion, "— money came from those niggers, those—niggers." Tr. at 3632–33. Campbell sought to cross-examine Pokorny on this matter, arguing that it reflected Pokorny's racial bias, which might also bias his testimony against Campbell, who is black, but the district court did not allow it. After reviewing the videotape, the district judge concluded that, "I don't again think that reflects any type of bias or prejudice that generally that type of a comment is attributable to." Tr. at 4496.

We believe that it may well have been preferable to allow Campbell the requested cross-examination. When we view the single statement in the context of the whole conversation (itself wholly peripheral to the issues at trial), however, we tend to agree with the district court that the statement, although odious and unfortunate, does not suggest the sort of bias that would lead Pokorny to testify falsely against Campbell, and that, therefore, the district court did not abuse its discretion in denying cross-examination on this matter.

## V. EXPERT DISCOURSE TESTIMONY

■ Campbell also challenges the district court's refusal to allow Dr. Roger Shuy to testify as an expert. Campbell attempted to call Dr. Shuy as a linguistics expert to testify about the tape-recorded conversations. The court permitted him only to testify as a lay witness, concluding that expert testimony was unnecessary where the tapes were already before the jury and their content within the jury's general knowledge.

A " 'district court has broad discretion regarding the admission or exclusion of expert testimony, and reversal of a decision on these matters is appropriate only when discretion has been abused.' " *Clarke,* 24 F.3d at 268 (quoting *Joy v. Bell Helicopter Textron Inc.,* 999 F.2d 549, 567 (D.C.Cir.1993)). Federal Rule of Evidence 702 permits expert testimony if the expert possesses "scientific, technical, or other specialized knowledge" that "will assist the trier of fact to understand the evidence or to determine a fact in issue." In this case, the district court was well within its discretion in concluding that expert testimony was unnecessary to elucidate tape recorded conversations. Such material not only involves matters of general knowledge, but is squarely within the traditional province of the jury. *See United States v. Edelman,* 873 F.2d 791, 795 (5th Cir.1989) (no abuse of discretion to exclude Dr. Shuy's testimony because it concerned "matters within the common knowledge of the jury"); *United States v. Devine,* 787 F.2d 1086, (7th Cir.1986) (upholding exclusion of Dr. Shuy's testimony because it would " 'not have given the jury significant help in understanding the

evidence or in determining a fact in issue, and understanding what is said in a tape recorded conversation is not outside the average person's understanding'") (quoting Dist.Ct.Op. of Dec. 17, 1984).

## VI. EX POST FACTO CLAUSE

 Finally, Campbell argues that the court's instructions on the continuing criminal enterprise charge violated the *ex post facto* clause, U.S. CONST. art. 1, § 9, cl. 3, by failing to charge the jury that it had to find that Campbell led the continuing criminal enterprise at some point after October 27, 1986, the date that the continuing criminal enterprise statute, 21 U.S.C. § 848(b), became effective. Campbell acknowledges that he failed to raise this claim below, and that it is therefore reviewed only for plain error.

The government presented evidence that Campbell led a drug distribution organization from 1985 to 1992, and Campbell argues that the jury could have found him guilty of leading a continuing criminal enterprise solely on the basis of acts occurring before October 27, 1986. Based on our review of the evidence and the jury verdict form, we are convinced that this is not so, and that Campbell has failed to demonstrate any prejudice from the absence of an instruction on the timing of his leadership role. Although the district court did not expressly charge the jury that it had to find that Campbell led the organization after October 27, 1986, it did charge the jury that it had to find that he had committed two or more of the twenty-seven transactions set forth on the special verdict form, and that Campbell was the leader or principal of the enterprise. All of the transactions identified on the form took place after October 27, 1986, and the jury found that Campbell committed fourteen of those acts during the period from the summer of 1988 to February, 1991. Special Verdict Form, *reprinted in* Campbell's Appendix at 85–89. We have no doubt, then, that even in the absence of an explicit instruction, the jury found that Campbell exercised his leadership role after the time that the continuing criminal enterprise statute became effective, and that, therefore, Campbell was not prejudiced by the absence of an explicit instruction in this regard.

## VII. SENTENCING

Mitchell raises several challenges to his sentencing, two of which have merit.[5]

### A. *Base Offense Level*

 Mitchell challenges the district court's attribution to him of the quantity of drugs involved in two transactions subsequent to his 1990 involvement on the sole grounds that those transactions were reasonably foreseeable to him.

Applying traditional principles of co-conspirator liability, this court has recently held that "reasonable foreseeability" alone does not suffice as a basis to attribute drugs to co-conspirators. *See United States v. Saro*, 24 F.3d 283, 288 (D.C.Cir.1994). Rather, we observed, members of a conspiracy may engage in their own side deals for which their co-conspirators are not liable, and certain conspiracies operate on a "hub and spoke" model, in which "many participants ... are parties only to small sub-conspiracies." *Saro*, 24 F.3d at 289. If either of these scenarios is plausible, then, the sentencing court must make findings about the scope of the conspiratorial agreement the defendant joined, and attribute to him only those drugs that are *both* reasonably foreseeable to him and in furtherance of that agreement. *See id.*

In this case, Campbell's activities spanned several years and cities, and his co-conspirators varied with the time and location. In-

---

5. Both defendants also argue that, for sentencing purposes, the distinction between cocaine powder and cocaine base is unconstitutional. Rather than brief these issues, defendants rely on arguments made in cases pending at the time their briefs were filed. Those cases have since been decided, and they hold that there is no basis to attribute a discriminatory purpose to the distinction between crack and cocaine and that the distinction does not, therefore, trigger strict scrutiny. *See United States v. Johnson*, 40 F.3d 436, 441 (D.C.Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 1412, 131 L.Ed.2d 297 (1995); *see also United States v. Thompson*, 27 F.3d 671, 678–79 (D.C.Cir.) (distinction survives rational basis review), *cert. denied*, —— U.S. ——, 115 S.Ct. 650, 130 L.Ed.2d 554 (1994).

deed, Mitchell himself had no involvement with Campbell between June, 1990, and 1992. Thus, it is not obvious that all of Campbell's drug transactions were part of a single conspiracy to which Mitchell was a party. Because the district court did not make such a determination, but sentenced Mitchell solely on the grounds of reasonable foreseeability, we conclude that his sentence must be vacated and remanded to the district court for specific findings on the scope of his conspiratorial agreement. It may be, of course, that Mitchell's conspiratorial agreement encompassed all of Campbell's activities, but this is a finding that the district court must make.

In sentencing, the district court adopted the recommendation of Mitchell's presentence report that ten kilograms of cocaine base be attributed to Mitchell, for a base offense level of 40. The ten kilogram quantity was calculated by adding to the four kilograms associated with the money that Mitchell drove to El Paso the narcotics involved in two transactions that occurred in Washington, D.C. subsequent to Mitchell's departure—1.5 kilograms that Campbell delivered to Stevens in August, 1990, and 4.5 kilograms that co-conspirator David Cathcart distributed to Stevens in October, 1990. Mitchell does not dispute the attribution of the four kilograms, but does dispute responsibility for the remaining six kilograms.[6]

Both the presentence report ("PSR") and the district court's discussion at sentencing make clear that the six kilograms involved in transactions subsequent to Mitchell's departure were attributed to him solely on the basis of reasonable foreseeability. Thus, the PSR recommended the attribution of the six kilos exchanged by Campbell's organization in the four months subsequent to Mitchell's departure with no consideration of whether those transactions were within the scope of the agreement between Mitchell and Campbell:

Thereafter, Mr. Campbell sent an additional 1.5 kilograms of cocaine base to Washington, D.C., and then worked with David Cathcart to send 4.5 kilograms of cocaine base to Washington, all of which was "reasonably foreseeable" to the participants in the conspiracy at the time, particularly Mr. Mitchell.

PSR ¶ 41 at 11. The prosecutor argued for the attribution of these six kilos "under the doctrine basically of the fact that it would be reasonably foreseeable," Transcript of Sentencing Hearing at 13, *United States v. Mitchell* (D.D.C. Dec. 13, 1993) (Cr. No. 92–213–02) ("Sentencing Tr."), and the district court ruled on these grounds:

[I]t seems reasonably foreseeable to the Court and I'm satisfied upon the evidence presented to the jury, as I consider it for sentencing purposes, that the jury having found that the government had proven beyond a reasonable doubt [the distribution of six kilos], that Mr. Mitchell, having been engaged by Mr. Campbell to deliver the monies and being involved with Mr. Campbell thereafter certainly as to the attempts to deliver drugs in from Mexico, that it is fair to attribute to him the additional cocaine base that was delivered to Washington.

Sentencing Tr. at 25.

Nowhere did the district court find that these drug transactions were made in furtherance of the conspiracy between Mitchell and Campbell. Nor is such a finding implicit in face of the evidence. Given the break in relations between Campbell and Mitchell and the fact that Campbell's activities were divided into relatively discrete segments in different cities during different time periods, the "hub and spoke" scenario is sufficiently plausible to make it incumbent upon the district court to make a finding about the scope of

---

6. The government argues that Mitchell waived his objection to the attribution of 1.5 of these six kilograms by failing to challenge them below, in which case any error in the attribution of the 4.5 kilograms would be harmless, because the sentence is identical for 5.5 and for 10 kilograms. A simple review of the sentencing hearing, however, reveals that Mitchell plainly argued that *"nothing* that Mr. Campbell was involved in in

the interim two-year period" between Mitchell's trip to El Paso and his resumption of contact with Campbell in 1992 "could be attributable to Mr. Mitchell." Sentencing Tr. at 10 (emphasis added). As both the 1.5 and 4.5 kilogram transactions took place during this time period, Mitchell did not waive his challenge to either transaction.

the conspiratorial agreement between Campbell and Mitchell.

In sum, the district court applied the wrong legal standard in attributing drugs to Mitchell solely on the basis of reasonable foreseeability. Accordingly, we vacate the sentence and remand for further proceedings. On remand, the district court must ascertain whether the distribution of these drugs was within the scope of the conspiratorial agreement between Campbell and Mitchell.

### B. *Additional "Plain Error" Challenges*

Mitchell raises several additional challenges to his sentencing, all, as he concedes, reviewable only for plain error because he failed to raise them below. An error is plain if (1) it is so obvious that " 'the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it,' " and (2) it was prejudicial. *Saro*, 24 F.3d at 286 (quoting *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)). For purposes of sentencing, a defendant can establish prejudice if he shows "a reasonable likelihood that the sentencing court's obvious errors affected his sentence." *Id.* at 288.

### 1. *Acceptance of Responsibility*

 Mitchell argues that the district court erred in denying him a reduction for accepting responsibility. The PSR initially recommended a two-point reduction for acceptance of responsibility, but, upon the government's challenge, reconsidered. The PSR (and thus the sentencing court, because it offered no further discussion of the issue) explained this reconsideration on the grounds that Mitchell:

[ (1) ] did not make an effort to provide timely information to the government concerning his own involvement in the offense; [ (2) ] did put the government to its burden of factual proof at trial and therefore does not qualify for a reduction.

Addendum to the Presentence Report at 22. Mitchell argues that neither ground was acceptable. With respect to the first ground, he asserts that under the Sentencing Guidelines ("Guidelines"), timeliness is only rele-

vant to whether an *additional* one-point reduction is warranted, not to whether the basic two-point reduction is warranted. This is incorrect. The Guidelines provide for a two-point reduction if "the defendant clearly demonstrates acceptance of responsibility," U.S.S.G. § 3E1.1(a), and an additional one point reduction if the defendant "timely provid[es] complete information to the government," U.S.S.G. § 3E1.1(b). The application notes, however, instruct that timeliness is also a consideration in determining whether the defendant qualifies for the initial two-point reduction. *See* U.S.S.G. § 3E1.1, comment. (n.1(h)) (appropriate considerations for subsection (a) include "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility").

 As to Mitchell's decision to go to trial, although we are not certain of the PSR's intent, it can be read as applying a *per se* rule that the decision to go to trial automatically precludes an acceptance of responsibility reduction. This understanding is plain error. Although this court has upheld the consideration of a decision to go to trial in determining where, within the range of reduction for cooperation, the defendant should be placed, *see United States v. Jones*, 997 F.2d 1475, 1476 (1993) (*in banc*), *cert. denied*, — U.S. —, 114 S.Ct. 741, 126 L.Ed.2d 704 (1994), "[c]onviction by trial ... does not *automatically* preclude a defendant from consideration for such a reduction." U.S.S.G. § 3E1.1, comment. (n.2) (emphasis added). As the application notes explain:

In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

*Id.* Thus, to the extent that the PSR applies a *per se* rule that the decision to go to trial

bars a reduction for acceptance of responsibility, it does plainly err. However, we think it far from "reasonably likely" that Mitchell's case is one of the "rare situations" in which a defendant who proceeds through trial is entitled to a reduction for acceptance of cooperation. *See Jones,* 997 F.2d at 1487 (application note 2 "explicitly tells judges. that they normally should deny the two-point reduction to a defendant who does not plead guilty"). Thus, because Mitchell has not shown that the PSR's error prejudiced him, he has not satisfied the second prong of the plain error test. *See Saro,* 24 F.3d at 288.

### 2. *Criminal History—Duration of Conspiracy*

■ Mitchell also challenges the addition of points for engaging in criminal activity while on probation. Calculation of Criminal History under the Guidelines provides for the addition of two points if the defendant commits the instant offense while on probation. *See* U.S.S.G. § 4A1.1(d) & comment. (n.4). Mitchell was placed on probation in June, 1992 for driving under the influence. The conspiracy of which Mitchell was found guilty was identified in the indictment and verdict form as lasting through July, 1992, but there was no evidence that Mitchell or others engaged in any acts in furtherance of the conspiracy after June, 1992, when Mitchell was placed on probation.

As this court has instructed, in establishing that one is no longer acting in a conspiracy, "the defendant [has] the burden of proving that [he] affirmatively withdrew from the conspiracy." *United States v. Dale,* 991 F.2d 819, 854 (D.C.Cir.) *(per curiam) cert. denied,* —— U.S. —— & ——, 114 S.Ct. 286 & 650, 126 L.Ed.2d 236 (1993). Given this burden, it was not plain error to conclude that Mitchell participated in the conspiracy while on probation.

### 3. *Minor or Minimal Participant*

■ Mitchell argues that the district court erred in not giving him a downward adjustment as a minor or minimal participant under U.S.S.G. § 3B1.2. As Mitchell did not make this argument below, it is also reviewed for plain error. In addition, decisions not to depart downwards "are generally reviewable only to the extent that they were imposed in violation of law or were imposed as a result of an incorrect application of the Sentencing Guidelines." *United States v. Ortez,* 902 F.2d 61, 63 (D.C.Cir.1990).

U.S.S.G. § 3B1.2 provides:

Based on the defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

The notes explain that a "minimal participant" "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." U.S.S.G. § 3B1.2, comment. (n.1). A "minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n.3).

During the sentencing hearing, the court made findings that would place Mitchell squarely in the "minor participant" category, concluding that Mitchell was less culpable. than the other players:

It is my hope some day, Mr. Mitchell, that either through Congress['s] actions or otherwise under the guidelines if appropriate, that you could be back before this Court to receive some other consideration in the length of sentence you'll have to serve, because I think you have been caught up in this ring and that while you're legally responsible for the activities, as I found it, *I believe that your level of culpability compared to others in this ring,* including cooperating witnesses, who will get a lot less sentence than you will get, *your level of culpability is not as great,* but for whatever reasons, you went to trial in this case,

and the jury is the one that made the determination after a lengthy trial.

Sentencing Tr. at 32–33.

Thus, the district court made an express finding that Mitchell was less culpable than "others in the ring." The Guidelines, in turn, issue an unequivocal directive to "decrease by 2 levels" "[i]f the defendant was a minor participant in any criminal activity" and define a minor participant as "any participant who is less culpable than most other participants." Although we do not now determine whether it might be possible to find that a defendant "is less culpable than most other participants" and nevertheless deny him the reduction due to "minor participants," we do hold that it was plain error and an incorrect application of the Guidelines for the district court to fail even to consider Mitchell's eligibility for the reduction upon making the finding that he was less culpable than his co-conspirators.[7]

### VIII. Conclusion

In accordance with the discussion above, the convictions of both defendants are affirmed and Mitchell's sentence is vacated and remanded.

---

7. In *United States v. Foster*, 988 F.2d 206, 209 (D.C.Cir.1993), *cert. denied,* —— U.S. ——, 113 S.Ct. 2431, 124 L.Ed.2d 651 (1993), by contrast, where we found no plain error in the district court's failure to make a "minor participant" reduction, the district court had not made the explicit finding that triggers § 3B1.2.