UNITED STATES of America,
Appellee,

v.

Talib D. WATSON, Appellant.

No. 97–3153.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 9, 1998.

Decided April 9, 1999.

Peter K. Levitt argued the cause for appellant. With him on the briefs was Peter M. Brody, appointed by the court.

Karen Melnik, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney, John R. Fisher and Elizabeth Trosman, Assistant U.S. Attorneys.

Before: EDWARDS, Chief Judge, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

Dissenting opinion filed by Circuit Judge GARLAND.

ROGERS, Circuit Judge:

The critical issue at Talib Watson's second trial on narcotics-related charges was whether Watson had a connection to a large stash of cocaine base and heroin found inside a burgundy Subaru automobile.[1] Watson did not own the Subaru, nor did any witness or fingerprint evidence place him in the vehicle. To prove his connection to the car, the government relied on a key to the Subaru that the police found on Watson when he was arrested, a Shaw's jewelry bag containing nearly 100 grams of cocaine base that the police found in the car, and a receipt from a Shaw's store that the police found in Watson's home. Defense witnesses, however, placed Watson in church for part of the evening in question and disputed a police officer's testimony that Watson had the car key at the time of his arrest. Instead, defense witnesses connected Everett Hawkins to the Subaru and the car key on the day and evening in question. To strengthen the evidence of Watson's connection to the Subaru, the government attempted to prove that the owner of the car was his girlfriend. The attempt was fumbled, however, when the prosecutor asked a defense witness a compound question assuming a fact not otherwise in evidence, namely that the registered owner of the car was Watson's girlfriend, and then eliminated the ambiguity in the witness' response by purporting to quote the witness' testimony during closing argument to the jury. Because credibility was hotly disputed and the evidence connecting Watson to the car was not weighty, we conclude that the standard jury instructions that the arguments of counsel and counsel's questions are not evidence were insufficient to mitigate the substantial prejudice arising from the prosecutor's misstatement of the evidence. Accordingly, we reverse the judgment of conviction and remand the case for a new trial.

## I.

Between 5:30 and 6 p.m. on September 27, 1995, the police received an anonymous telephone call advising that an unidentified person wearing a black baseball cap, blue jeans, and a blue jean jacket had been selling drugs all day near 18th and D Streets, N.E, operating out of a burgundy Subaru with temporary Maryland tags. Around 9 p.m., five plainclothes police officers arrived at the scene. According to three officers, Watson handed a "dark object" to Theodore Ford, who dropped the object, later determined to be a gun, into a trash can. When the police attempted to arrest Watson, two officers testified that he dropped five ziplock bags to the ground that contained about one gram of cocaine base. A third officer testified that he removed from Watson's person a key, a pager, and $57 in United States currency. The key opened the burgundy Subaru.

Upon searching the Subaru, the police found in the glove compartment a Shaw's jewelry bag that contained nearly 100 grams of cocaine base, about a half gram of heroin, as well as a gray sponge, a scale, and empty ziplock bags. According to the police, when Watson saw that the police had found the jewelry bag, he attempted to run. The police grabbed him; Watson hit one of the officers with a police flashlight; and then as other officers held Watson to the ground he yelled to the crowd for help. Gun shots erupted from the crowd. When the area was secure, the police transported Watson and Ford for processing. Upon executing a search warrant of Watson's home, the police found an

1. Watson's first trial ended in a mistrial. At this second trial, he was convicted of possessing 50 or more grams of cocaine base with intent to distribute (21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii)(1994)), and aiding and abetting (18 U.S.C. § 2); possession with intent to distribute cocaine base within 1000 feet of a school (21 U.S.C. § 860(a)), and aiding and abetting (18 U.S.C. § 2); possession with intent to distribute heroin (21 U.S.C. § 841(a)(1)), and aiding and abetting (18 U.S.C. § 2); and assault on a police officer (D.C.Code Ann. § 22–505(a)(1981)). He was acquitted of firearms charges.

August 8, 1995, receipt for a purchase at a Shaw's jewelry store.

Watson's defense was part alibi and part mistaken identification. The president and a minister of God's Healing Temple both testified that Watson arrived at church for a recital between 6 and 7 p.m., around the time the police received the anonymous tip, and he did not leave until 8 p.m. Other defense witnesses testified that another man had been selling drugs out of the Subaru all day and ran, discarding various items, when the police arrived in response to the anonymous tip. Leonard Butler, a bystander at the scene, testified that he saw Everett Hawkins standing in the alley near the trash can where the gun was found, and that upon seeing the police, Hawkins ran down the alley discarding objects. Raymond Thomas testified that he saw Hawkins in the area that day wearing a jeans outfit and a hat and that Hawkins left the area when the police arrived. Three other defense witnesses testified that the police initiated the brawl with Watson, beating him with the butt of a gun, their fists, and flashlights.

Defense witnesses also disputed the government's evidence regarding the Subaru. Anthony Shank, another bystander, testified that he saw an officer remove Watson's shoe laces and belt, but not the Subaru key, from his person. Raymond Thomas put Everett Hawkins in the Subaru on the night in question. A sixteen-year-old high school student testified that the Subaru belonged to Hawkins, that Hawkins was in the car on the day in question (and on other occasions), and that the key introduced into evidence by the government was the key Hawkins used to open the Subaru. To corroborate his version of events, the student testified that on the afternoon of the day in question he left his school books in the Subaru; the government stipulated that the police found his books inside the Subaru.

## II.

On appeal Watson contends that he is entitled to a new trial on three grounds:

first, the district court abused its discretion under Rule 403 in admitting his 1988 conviction for drug trafficking inasmuch as possession was the only contested issue and there was ample other evidence to show knowledge and intent; second, the district court plainly erred in allowing expert witness testimony in the form of mirroring hypotheticals suggesting personal knowledge of Watson's intent to distribute; and third, the district court erred in denying his motion *in limine* to restrict the prosecutor from misstating evidence during closing argument and the prosecutor's subsequent misstatement of the evidence during closing argument substantially prejudiced his right to a fair trial. Because we conclude that Watson's third ground requires reversal of his conviction, we limit our comments on his first two grounds to matters that are likely to arise upon retrial.

## A.

During closing argument to the jury the prosecutor misstated a defense witness' testimony on a critical point and did so while purporting to quote the witness' testimony. The unfortunate sequence of events arose when the prosecutor cross-examined defense witness Raymond Thomas about whether Tyra Jackson, the registered owner of the Subaru where the drugs and contraband were found, was Watson's girlfriend. In asking the question, however, the prosecutor presented the witness with a compound question assuming a key fact not in evidence—namely, that Jackson was Watson's girlfriend—with the result that the witness' response was ambiguous on the critical point the prosecutor sought to establish. Yet in closing argument the prosecutor, purporting to quote the defense witness, told the jury that Jackson was Watson's girlfriend, thereby establishing a stronger connection of Watson to the Subaru than the disputed evidence regarding

the Subaru key and the seven week old sales receipt from Shaw's jewelry store. Otherwise the Subaru had been connected only to Jackson as the owner and to Hawkins as the user of her car. We review the record to emphasize both the significance of the evidence at issue and the context in which the prosecutor's error occurred.

On cross examination during the defense case, the prosecutor asked Raymond Thomas about his knowledge of Tyra Jackson. The prosecutor asked, "Mr. Thomas, you believe that you know Watson's girlfriend, Tyra Jackson, right?" Thomas replied: "I never testified I knew her or not." The prosecutor then asked, "You believe that you may have met her once or twice, right?" Thomas's response: "Maybe." Thus, the witness' reference to "her" might have been simply to Tyra Jackson as an individual rather than as Watson's girlfriend; the form of the question rendered the response ambiguous.

Prior to closing argument, Watson's counsel moved *in limine* to exclude from the prosecutor's closing argument any reference to Tyra Jackson being Watson's girlfriend. Defense counsel argued that the prosecutor's question had assumed a fact not in evidence, namely that Tyra Jackson was Watson's girlfriend. As defense counsel recalled, somewhat inaccurately, the prosecutor had asked Thomas "Have you ever met Mr. Watson's girlfriend, Tyra Jackson?," and Thomas responded "I think I have." The district court stated that it thought that the witness had answered "Yes," and that any ambiguity about whether she was Watson's girlfriend should have been taken care of on redirect; the court ruled that the witness' answer placed the fact in evidence and denied the defense motion.

In his initial closing argument, the prosecutor told the jury:

We have the registration to the car, the Subaru. I[t] is in the name of Tyra Jackson. It's not in the name of … Everett Hawkins. It's in the name of Tyra Jackson. The only evidence we have about Tyra Jackson is Thomas's answer, one of the defense witnesses, "Do you think you met Tyra Jackson?" "Well, I think I met her once or twice. I think I've met Watson's girlfriend, Tyra Jackson once or twice." Tyra Jackson's car, the registration to the Subaru.

In rebuttal closing argument the prosecutor reiterated the point: "We've got the evidence from [Watson's] witness that he thinks he knows Tyra Jackson, his [Watson's] girlfriend, and the title to the car, the registration to the car." After closing arguments, the district court gave the standard instructions that counsel's questions, statements, and arguments are not evidence. *See* Criminal Jury Instructions for the District of Columbia, Instr. 1.07, 2.05.

Although a prosecutor's statements in closing argument will rarely warrant a new trial, *see United States v. Young,* 470 U.S. 1, 10–11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), *United States v. Edelin,* 996 F.2d 1238, 1243 (D.C.Cir.1993), Watson's is such a case. It is error for counsel to make statements in closing argument unsupported by evidence, to misstate admitted evidence, or to misquote a witness' testimony. In the instant case the prosecutor's remarks were error to the extent that they misstated and misquoted Raymond Thomas's testimony. *See United States v. Gartmon,* 146 F.3d 1015, 1025 (D.C.Cir.1998). We do not decide whether the district court erred in denying Watson's motion *in limine,* but focus solely on the prosecutor's misquotation and misrepresentation of the witness' testimony during closing arguments to the jury.[2]

2. Although Watson lists as an issue on appeal that the district court erred in denying his motion *in limine,* he never argues the point in his brief. Accordingly, we decline to address his "asserted but unanalyzed" argument. *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983); Fed. R.App. P. 28(a)(6); *see*

A misstatement of evidence is error when it amounts to a statement of fact to the jury not supported by proper evidence introduced during trial, regardless of whether counsel's remarks were deliberate or made in good faith. *See Gartmon,* 146 F.3d at 1025; *United States v. Donato,* 99 F.3d 426, 432–33 (D.C.Cir.1996); *United States v. Small,* 74 F.3d 1276, 1280–81 (D.C.Cir.1996); *United States v. Perholtz,* 842 F.2d 343, 360–61 (D.C.Cir.1988); *Gaither v. United States,* 413 F.2d 1061, 1079–80 (D.C.Cir.1969). The misstatement constituting error is demonstrated here by comparing the witness' testimony with the statements made by the prosecutor in closing arguments. *See Gartmon,* 146 F.3d at 1025; *Perholtz,* 842 F.2d at 360; *Gaither,* 413 F.2d at 1078. The government does not dispute that the prosecutor purported to quote Thomas's testimony. Yet the quote was inaccurate; the error is apparent on the face of the record.

That Watson is entitled to a new trial by reason of the error is demonstrated by application of this circuit's test designed to determine whether a defendant ·has suffered sufficient prejudice to warrant a new trial. *See Gartmon,* 146 F.3d at 1026. The test consists of three factors:

> "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." We have also framed the test for prejudice in terms of the severity of the prosecutor's misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks.

*Gartmon,* 146 F.3d at 1026 (quoting *United States v. North,* 910 F.2d 843, 895, *superseded in part on other grounds,* 920 F.2d 940 (D.C.Cir.1990)). This test applies regardless of whether our ˙review is for harmless error or plain error.[3] *Id.* The court determines how the prosecutor's misstatements prejudiced Watson in light of the evidence presented, asking not whether evidence was sufficient to convict notwithstanding the error, but rather whether the court can say that the error did not affect the jury's verdict; if in "grave doubt," the court cannot affirm Watson's conviction. *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), *cited in Lane v. United States,* 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986); *United States v. Smart,* 98 F.3d 1379, 1391–92 (D.C.Cir. 1996).

Each of the relevant factors points to substantial prejudice in Watson's case. First, the case was close, and credibility was key. A parade of eyewitnesses for the government and the defense recounted different versions of what occurred at critical points, from Watson's whereabouts at the time the tip was received, to what he was doing when the police apprehended him, to where Everett Hawkins fit into the picture, and most importantly to Watson's connection to the Subaru. Even though three police officers testified that Watson handed co-defendant Thomas something that ˙turned out to be a gun, the jury discredited that testimony. *See supra* n. 1. Only one officer claimed he took the car key off Watson's person and although another officer testified that he may have seen the key taken off Watson, the testimony about the key was disputed by defense witnesses. Police testimony otherwise linking Watson to the Subaru was disputed by defense witnesses who placed

also Washington Legal Clinic for the Homeless ˙v. Barry, 107 F.3d 32, 39 (D.C.Cir.1997).

**3.** *Compare United States v. Richardson,* 161 F.3d 728, 737 (D.C.Cir.1998) (plain error review) *with Donato,* 99 F.3d at 432–33 (harmless error review). Because Watson sought, by a motion *in limine,* to prevent the prosecutor from arguing to the jury that Jackson was Watson's girlfriend and his motion was denied, any contemporaneous objection during closing argument˙would have been superfluous. *See United States v. Mendiola,*, 42 F.3d 259, 260 n. 2 (5th Cir.1994); *United States v. Wilson,* 26 F.3d 142, 158–60 (D.C.Cir.1994); *United States v. Mejia–Alarcon,* 995 F.2d 982, 985–88 (10th Cir.1993).

Everett Hawkins in a jeans outfit in the Subaru at relevant times and otherwise connected him to the car and the key. There was no fingerprint evidence linking Watson to either the key or the Subaru. Aside from Raymond Thomas's ambiguous testimony, the government's evidence connecting Watson to the Subaru consisted of the disputed testimony that the key was recovered from Watson's person and a Shaw's jewelry bag found in the car that the government sought to link to Watson through a seven week old receipt, which at best showed that he had purchased something from a Shaw's store.

Second, Raymond Thomas's testimony concerned a central issue in the case, namely Watson's connection to the Subaru. Although the police found five ziplock bags near Watson, the bags contained a relatively small amount of cocaine base, and the drugs in those bags were of a different concentration than the drugs recovered from the Subaru. Only the 100 grams of cocaine base, heroin, and drug paraphernalia found in the glove compartment of the Subaru permitted a reasonable inference of knowledge and intent to distribute, *see, e.g., United States v. Stephens*, 23 F.3d 553, 555–58 (D.C.Cir.1994), and triggered heightened penalties under 21 U.S.C. § 841(b)(1)(A)(iii)(1994). Yet Watson was not found in the car, nor did any witness or fingerprint evidence place him there. Connecting Watson to the Subaru was essential to the government's distribution case and its evidence in that regard was disputed. These circumstances highlight the prejudicial nature of the prosecutor's error.

Moreover, the prosecutor's question reflects his understanding that connecting Watson to the drugs in the Subaru was critical to the government's distribution case. Yet at the time he cross-examined Raymond Thomas, the prosecutor had yet to establish that the owner of the Subaru was Watson's girlfriend. The lack of clarity in Raymond Thomas's testimony stemmed directly from the prosecutor's use of a compound question and his assumption of a key fact not in evidence. The defense, of course, had no obligation to object to the prosecutor's question, much less to perfect the government's case by clarifying the witness' response on re-examination, but could rest satisfied with the response, which did not produce damaging testimony. Instead, defense counsel could properly move *in limine* to restrict the prosecutor's closing arguments, thus avoiding highlighting before the jury whether Jackson was Watson's girlfriend. Of course, once the district court denied defense counsel's *in limine* motion, assuming for purposes of this appeal no error in the district court's ruling, the prosecutor could properly use the witness' testimony in closing argument to show that Jackson was Watson's girlfriend. But the prosecutor was not thereby relieved of the obligation to ascertain the testimony with accuracy, much less the obligation to quote it accurately. The *in limine* motion placed the prosecutor on notice that at least defense counsel thought the prosecutor had not elicited a true admission from the witness that he knew Tyra Jackson was Watson's girlfriend. The prosecutor also knew that his compound question made a clear response doubtful. Nevertheless, rather than simply shrewdly characterizing or merely paraphrasing the witness' testimony, the prosecutor presented an inaccurate direct quotation of Thomas's testimony to the jury, eliminating the ambiguity on a central point. So far as the record reveals, no effort was made, either during argument on the *in limine* motion or before closing arguments, to check the court reporter's notes on Raymond Thomas's testimony; the absence of a transcript was irrelevant in this regard and cannot excuse prosecutorial carelessness.

Finally, the government can point to nothing by way of mitigation of the prejudice beyond the standard instructions that the opening statements and closing arguments of counsel are not evidence and that a lawyer's question is not evidence. *See*

Criminal Jury Instructions for the District of Columbia, Instr. 1.07, 2.05. Although the ameliorative effects of jury instructions are not to be underestimated, *see Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987); *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), there are limits when, as here, the instructions did not address the prosecutor's error in closing argument, and the error affected a central issue. Consequently, the instructions given could neither undo the error nor mitigate its prejudicial effects under these egregious circumstances. *See United States v. Teffera*, 985 F.2d 1082, 1089 n. 6 (D.C.Cir.1993); *see also Arizona v. Washington*, 434 U.S. 497, 512–13, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978); *United States v. Williams–Davis*, 90 F.3d 490, 507 (D.C.Cir.1996); *cf. Small*, 74 F.3d at 1284.

In sum, the error was not harmless. "This circuit has long made clear that the government must take care to ensure that statements made in opening and closing arguments to the jury are supported by evidence introduced at trial." *Small*, 74 F.3d at 1280. Faced with only minimal evidence on a key element in its case—Watson's connection to the Subaru—the prosecutor sought to make the critical link by purporting to quote a defense witness to state that Tyra Jackson, the owner of the car, was Watson's girlfriend. The government does not dispute that the prosecutor purported to quote this testimony, nor that a check of the court reporter's notes could have avoided the error. Moreover, the quote was completely wrong. Particularly where a defendant has filed an anticipatory motion *in limine*, the prosecutor was alerted to the fact that the existence of any evidence supporting this alleged relationship was disputed. The prosecutor's closing argument, then, cannot be absolved as no more than a shrewd characterization of testimony; it was wrong and

based on no evidence in the trial record. Moreover, the prosecutor repeated his misstatement: once in his initial closing argument by direct quotation and again on rebuttal by reference. There can be no doubt that the error was significant, for it went to the heart of the government's case on a matter with respect to which the government had no other weighty evidence. Given the centrality of the government's misstatements to the jury and the hotly contested other evidence of Watson's connection to the car, Watson has demonstrated substantial prejudice warranting a new trial.

### B.

Insofar as Watson's evidentiary contentions are likely to arise upon retrial, we offer two observations.

First, the admission of Watson's 1988 drug trafficking conviction under Rule 403 undoubtedly presents a close question. As Watson points out, in *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), the Supreme Court emphasized the appropriateness of the contextual approach in considering the probative value of prejudicial evidence under Rule 403. *See* 117 S.Ct. at 652. While *Old Chief* reinforces the prosecutor's right to tell the story with "descriptive richness," *id.* at 653, Watson's 1988 conviction seems, at best, remotely probative of non-contested issues. Even assuming, as in *United States v. Crowder*, 141 F.3d 1202, 1204–05 (D.C.Cir.1998) (in banc), Watson's prior drug involvement was of a similar type or conducted in a similar place,[4] its relevance to intent and knowledge is limited to establishing that Watson knows how to sell drugs. *Cf. United States v. Burch*, 156 F.3d 1315, 1324 (D.C.Cir.1998). The prior conviction is inadmissible to prove the contested is-

---

**4.** Watson's prior conviction, seven years old at the time of his arrest, was for possession with intent to distribute cocaine, not cocaine base, that was discovered during a police

search of a residence. While the residence was on the same block as the Subaru, there was no transaction at all.

sue, namely, possession. Yet the prejudicial effect of the evidence is strong because it invites the jury to infer that Watson has a propensity for drug offenses and therefore the drugs and paraphernalia found in the Subaru must be his. It is this inference that Rule 404(b) intends to preclude, and the danger has been recognized by this and other courts. *See, e.g., United States v. (Dennis) Mitchell,* 49 F.3d 769, 776–77 (D.C.Cir.1995); *United States v. (Timothy) Johnson,* 27 F.3d 1186, 1193 (6th Cir.1994); *United States v. (Michael) Johnson,* 970 F.2d 907, 912–14 (D.C.Cir. 1992). At a new trial, the district court can consider anew its Rule 403 balancing, considering as well whether a limiting instruction like those in the prior trials, distinguishing between "act" and "intent," is sufficient to overcome the prejudicial effect of the prior conviction. *See Crowder,* 141 F.3d at 1210.

■ Second, there is no basis in the record before the court on which to conclude that there was error, much less plain error by the district court in admitting the expert's testimony because, contrary to Watson's contention, there were no proscribed "mirroring hypotheticals" that in tandem with the form of the prosecutor's questions and the expert's responses impermissibly gave an opinion on Watson's state of mind. *See, e.g., United States v. Smart,* 98 F.3d 1379, 1385–89 (D.C.Cir. 1996); *United States v. Boyd,* 55 F.3d 667, 670–72 (D.C.Cir.1995); *United States v. (Keith) Mitchell,* 996 F.2d 419, 421–22 (D.C.Cir.1993). If some questions may have come close to the line of questioning that the court has found objectionable, *see, e g., Boyd,* 55 F.3d 667, expert testimony regarding the modus operandi of drug dealers, even if elicited through mirroring hypotheticals, does not violate Federal Rule of Evidence 704(b).[5] *See United States v. Toms,* 136 F.3d 176, 184–86 (D.C.Cir.1998). Rather, what is proscribed is questioning that produces responses suggesting some special knowledge of the defendant's mental processes. *See Toms,* 136 F.3d at 185. Examples of what is proscribed include expert testimony that the hypothetical person's conduct "met the elements" of the charged offense, *Smart,* 98 F.3d at 1385, that the hypothetical individual's possession was "consistent with intent to distribute," *Boyd,* 55 F.3d at 672, and that the hypothetical person's intent "was intent to distribute," *Mitchell,* 996 F.2d at 422. Here, by contrast, the prosecutor asked the expert about drug trafficking generally in the District of Columbia. He also asked how many "dosage units" would be contained in 100 grams of cocaine base, to which the witness responded "700," and concluded that "[m]y experience easily tells me that if any one individual possesses what's equivalent to 700 bags of crack cocaine [sic] is in the business of making money selling drugs in the streets of Washington, D.C. or whatever." Although the prosecutor did ask the expert whether he was familiar with the case, risking that the jury might be led to think that the expert had first-hand information about Watson, this reference did not indicate any familiarity with Watson's mental processes. *See United States v. Lipscomb,* 14 F.3d 1236, 1242–43 (7th Cir. 1994).

Accordingly, we reverse the judgment of conviction and remand the case for a new trial.

GARLAND, Circuit Judge, dissenting:

In the vast majority of criminal cases tried in this circuit, transcripts of witness testimony are not available at the time of closing arguments. This means that pros-

---

5. Federal Rule of Evidence 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," *see* Fed R. Evid. 704(a), except "[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged," *see* Fed.R.Evid. 704(b).

ecutors and defense counsel must rely on their recollections in making those arguments, and that judges must rely on theirs in ruling on objections. Innocent mistakes of recollection are inevitable and hardly uncommon. For protection from prejudice, our adversary system relies on the opportunity each side has to challenge the other's misstatements before the jury, and upon the court's standard admonition that it is the jury's recollection that controls. In the end, the jury's memory of what a witness actually said provides the corrective for errors made by the parties.

In light of this reality, it is not surprising that although "it is error for a prosecutor to mischaracterize evidence in a summation[,] [i]t is also clear ... that an error in a prosecutor's summation will only rarely warrant reversal of a conviction." *United States v. Donato,* 99 F.3d 426, 432 (D.C.Cir.1996); *see also United States v. Edelin,* 996 F.2d 1238, 1243 (D.C.Cir.1993) ("[W]e have generally been 'chary of reversing convictions solely on the grounds of a misstatement in a closing argument.' ") (citation omitted). Indeed, it is so rare that my colleagues are unable to cite a single case in which we have reversed a conviction solely for a prosecutor's misquotation of testimony *that the jury itself heard.*

It is "the law of this circuit that, even where challenges to a prosecutor's closing argument have been preserved through timely objection, we will reverse a conviction and require a new trial only if we determine that the defendant has suffered 'substantial prejudice.' " *United States ·v. Childress,* 58 F.3d 693, 715 (D.C.Cir.1995) (quoting *United States v. North,* 910 F.2d 843, 897–98 (D.C.Cir.1990)). We have "framed the test for prejudice in terms of the severity of the prosecutor's misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks." *Id.* at 715; *see also United States v. Gartmon,* 146 F.3d 1015, 1026 (D.C.Cir.1998) (noting variety of similar formulations). It is only in

the most egregious of cases that we will consider reversal, *see North,* 910 F.2d at 897 n. 33, and an examination of the applicable factors makes clear that this is not such a case.

## A

As the court recognizes, the first step in determining the severity of a prosecutor's misstatement is to compare it with the witness' actual testimony. A misstatement is error, but only "to the extent that [it] overstate[s]" the testimony. *Gartmon,* 146 F.3d at 1025 (quoting *United States v. Perholtz,* 842 F.2d 343, 360 (D.C.Cir.1988)). In this case there clearly was an overstatement, but the difference between the witness' testimony and the prosecutor's characterization is not as substantial as the court's opinion suggests.

The problem in this case began with a classic error in trial technique. *See* THOMAS A. MAUET, FUNDAMENTALS OF TRIAL TECHNIQUES 385 (1980). The prosecutor asked what was in essence a compound question: "Mr. Thomas, you believe that you know Watson's girlfriend, Tyra Jackson, right?" In so doing, he effectively asked both whether the witness knew Ms. Jackson, and whether the witness knew her to be the defendant's girlfriend. At that point, the equally-classic "objection as to form" would have been in order. Defense counsel, however, did not make it. Instead, the cross-examination unfolded as follows:

Prosecutor: Mr. Thomas, you believe that you know Watson's girlfriend, Tyra Jackson, right?

Thomas: I never testified I knew her or not.

Prosecutor: You believe that you may have met her once or twice, right?

Thomas: Maybe.

The court may be correct in stating that the defense had no obligation to object to the prosecutor's question. But my colleagues are wrong in suggesting that the

defense could "rest satisfied" with the witness' response because it "did not produce damaging testimony." Op. at 701. In fact it did. As the court notes, the compound question yielded an ambiguous response—the classic consequence of asking such a question. But ambiguity is not the same as the absence of evidence. A reasonable jury could have concluded that Thomas would have disputed the implication that Jackson was Watson's girlfriend if it were untrue or if he did not know it to be true—particularly since he had already exhibited a willingness to resist the prosecutor's assumptions. *See* 5/1/96 Tr. at 50. ("I never testified I knew her or not."). Accordingly, a reasonable jury could well have interpreted Thomas' answers as assent to the implied question—do you know Tyra Jackson to be Watson's girlfriend? Although the defendant did not have to risk "perfect[ing] the government's case by clarifying the witness' response," Op. at 701, by not doing so he accepted the risk that the jury would reasonably read the ambiguity against him.[1]

It is true that when the prosecutor recounted the exchange in closing argument, he erred by "eliminating the ambiguity" in Thomas' testimony. Op. at 701. The prosecutor told the jury that Thomas had said: "I think I've met Watson's girlfriend, Tyra Jackson once or twice." This was a stronger version of the witness' testimony and hence was error. But since it was an inference that a reasonable jury could have derived on its own, the measure of the difference is one of degree. The prosecutor did no more than make express what a juror could reasonably have found implicit

in the witness' answers. This was error, but not egregious error.

Nor was the prosecutor's misstatement an intentional one. Recalling the precise contours of a witness' testimony is a difficult task in the best of circumstances, made all the more difficult here by the witness' ambiguous answer to the prosecutor's compound question. When defense counsel made his motion in limine concerning the statement, he did so orally, without notice, and without obtaining a transcript to support his motion. In the absence of that transcript, all of the participants were forced to rely on their recollections—and all of those recollections were erroneous to some degree. *See* Revised Appendix ("App.") 161. Although the prosecutor's memory was worse than that of defense counsel, it did not vary significantly from that of the judge.[2] Thus, it can hardly be said that the defense's uncorroborated allegation put the prosecutor on notice that he had not obtained the admission he thought he had.

Finally, in measuring the severity of the prosecutor's error, it is also important to note that it involved just one sentence in each of the prosecutor's two closing arguments.[3] Those arguments spanned more than twenty pages of transcript. As we have said many times before, such isolated misstatements rarely amount to severe misconduct. *See, e.g., Gartmon,* 146 F.3d at 1026; *North,* 910 F.2d at 897; *Perholtz,* 842 F.2d at 361.

**B**

The next factor to consider in measuring the substantiality of prejudice is whether

---

1. On the other hand, as the district court pointed out, if Jackson were not defendant's girlfriend or if Thomas did not know, defense counsel could easily have covered the point during his redirect examination of Thomas. *See* 5/2/96 Tr. at 24.

2. In response to defense counsel's contention that "there's no evidence that Tyra Jackson was the girlfriend," the court responded: "I thought the witness answered 'yes.'" 5/2/96 Tr. at 23.

3. Indeed, while the sentence in the initial closing argument was erroneous because the prosecutor presented it as if it were a direct quotation of the witness' testimony, the sentence employed in the rebuttal appears more as characterization than quotation, and hence may not have been error at all. *See Donato,* 99 F.3d at 432 (holding that "fair, if disputed, characterization" of testimony does not constitute error).

measures were available to mitigate its impact. The error at issue here was the inaccurate recitation of testimony that the jury itself heard. Hence, if the jury relied on its own recollection, rather than on that of the prosecutor, the error would be without effect. The judge gave two separate instructions designed to ensure precisely that result:

> If any reference by the court or the attorneys to evidence does not coincide with your own recollection of the evidence, it is your recollection which should control during your deliberations.

> The statements and arguments of the lawyers are not evidence. They are only intended to assist you in understanding the evidence.

The court also gave an additional instruction aimed directly at the kind of problem engendered by a compound question:

> Sometimes a lawyer's question suggests that something is a fact. Whether or not something is a fact depends on the witness's answer, not the lawyer's question. A lawyer's question is not evidence.

Both the Supreme Court and this court have repeatedly held such instructions sufficient to mitigate prejudice caused by prosecutors' misstatements in closing arguments.[4] Moreover, it bears emphasizing that this is not a case in which the prosecutor asserted knowledge of evidence nei-

ther seen nor heard by the jury, nor subject to cross-examination by the defense.[5] In such a case, it might be argued that an instruction that the jury's recollection controls is of questionable value since the jury has no recollection on which to rely. Here, by contrast, the dispute was solely about evidence the jury did hear, and as long as the jury followed the court's instructions the prosecutor's error would be mitigated. *See Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) ("[J]uries are presumed to follow their instructions.").

We also cannot ignore defense counsel's failure to use his closing argument to tell the jury that the prosecutor had misstated the evidence. Pointing out such a misstatement can have a powerful, even devastating effect on an opponent's case. Had defense counsel used his closing argument in that fashion, we doubtless would have found it sufficient to mitigate the impact of the misstatement. *See, e.g., United States v. Williams–Davis*, 90 F.3d 490, 507–08 (D.C.Cir.1996) (holding that although government's opening statement blamed defendants for two murders as to which it never introduced evidence, defense counsel was able "to use the variance between the government's opening and its proof to sow doubt of the prosecution among the jurors"); *North*, 910 F.2d at 895; *Cross v. United States*, 353 F.2d 454,

---

4. *See, e.g., Zafiro v. United States*, 506 U.S. 534, 541, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) ("[T]he District Court admonished the jury that opening and closing arguments are not evidence.... These instructions sufficed to cure any possibility of prejudice."); *Gartmon*, 146 F.3d at 1026 ("[T]he judge gave the standard limiting instruction that lawyers' arguments are not evidence and that the jury's recollection of the evidence controls. We have repeatedly said this kind of instruction can mitigate the impact of erroneous jury argument."); *North*, 910 F.2d at 897 ("Our unwillingness to reverse a conviction has been particularly pronounced when the trial judge issues curative instructions.... Here [the judge] ... explicitly reminded the jurors that 'the statements, opinion and arguments of counsel are not evidence'.... [and that]

the jurors' 'recollection alone' is controlling as to 'all aspects of the evidence.' The District Judge could not have more directly communicated to the jury the limited evidentiary value of closing arguments.").

5. *United States v. Teffera*, 985 F.2d 1082 (D.C.Cir.1993), cited by the court, is an example of such a case. There, we reversed a conviction because the evidence was insufficient to convict. *See* 985 F.2d at 1089. We indicated in dicta, however, that we would also have reversed based on the prosecutor's repeated references in closing argument to alleged "eye contact" between the two codefendants—which we characterized as "phantom evidence" that was not "adduced at trial." *Id.* at 1089 n. 6.

455 (D.C.Cir.1965). The defense's failure to take advantage of this curative opportunity cannot put it in a better position than if it had—at least not without creating a powerful incentive to let misstatements pass without comment in the hope of obtaining a second bite at the apple if the jury's verdict should be unfavorable.

## C

Finally, we must consider the weight of the government's evidence. As my colleagues correctly note, the government's case against Watson cannot be characterized as overwhelming. But the evidence against the defendant was certainly "weighty," and that is sufficient to uphold his conviction in light of the other factors discussed above. See Brecht v. Abrahamson, 507 U.S. 619, 639, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (holding Kotteakos harmless error standard satisfied where "evidence of guilt was, if not overwhelming, certainly weighty"); Childress, 58 F.3d at 716 (indicating that the various factors must be weighed against each other in determining whether prosecutorial remarks caused substantial prejudice). The evidence tying Watson to $14,000 worth of crack cocaine was as follows.

First, a search of Watson's person produced a key to a car that was parked fifteen feet from the spot at which Watson was arrested. Although the court describes the searching officer's testimony as "disputed," Op. at 698, that description is overstated. Only one defense witness, Anthony Shank, testified about the search of Watson, and he merely said that "the only thing I saw them remove from him was his shoe strings and belt." App. 152. Shank did not affirmatively testify that there was no key; he was not even asked whether he saw a key. Nor is Shank's testimony inconsistent with the officer finding the key when Shank was not looking; there was no testimony that anyone saw the officer find the key elsewhere. Indeed, although the court may regard Shank's testimony as a powerful attack on the officer's credibility, apparently defense counsel did not appraise it the same way: he did not even mention Shank's testimony in his closing argument.[6]

Second, inside the car's glove compartment the police found large rocks of crack cocaine wrapped in a Shaw's Jewelry bag. The officers testified that when Watson saw they had found the bag, he began struggling violently to escape. Inside the Shaw's bag, along with the crack, were five black ziplock bags matching five other bags that fell from Watson's hand when he was arrested. See 4/25/96 Tr. at 19–20, 224.[7] And inside Watson's house was a receipt for a purchase at Shaw's Jewelry just seven weeks before—a purchase made using the same alias Watson gave police

---

6. A second defense witness, a high school student, testified that the key the government introduced into evidence "look[ed] like" a key he saw in the possession of a different individual (Everett Hawkins) five hours earlier on the day of Watson's arrest. See App. 131. Like Shank's, that testimony was not inconsistent with Watson having the key when he was arrested.

The court also suggests that the jury disbelieved the police witnesses, because it acquitted Watson of a firearms charge despite their testimony that they thought they saw Watson pass a gun to a codefendant. By the same logic, we could say that the jury disbelieved Shank, because it found defendant guilty of assaulting a police officer despite Shank's testimony that the assault was actually perpetrated by the police. In fact, the better view

is simply that propounded by the Supreme Court in United States v. Watts: "[I]t is impossible to know why a jury found a defendant not guilty on a certain charge. An acquittal is not a finding of any fact.... Without specific jury findings, no one can logically or realistically draw any factual finding inferences." 519 U.S. 148, 117 S.Ct. 633, 637, 136 L.Ed.2d 554 (1997).

7. The court notes that the drugs in the latter five bags were of a different concentration than the drugs recovered from the car. That difference was quite small (39% vs. 42%), and not at all inconsistent with all of the crack cocaine coming from the same batch. See United States v. Robinson, 59 F.3d 1318, 1320 (D.C.Cir.1995) (citing testimony of DEA chemist).

when he was arrested on the instant charge. It would be surprising if the jury regarded that purchase as nothing more than an unfortunate coincidence.

Third, the district court properly admitted, under Federal Rules of Criminal Procedure 403 and 404(b), evidence that Watson previously had been convicted of committing the same crime—possession with intent to distribute cocaine—on the same city block. *See* 4/26/96 Tr. at 13–14. Although this cannot alone prove that Watson possessed the drugs on the instant occasion, it can be used to prove he intended to distribute the cocaine in the Shaw's bag, and "may be a 'brick in the wall of evidence' proving possession." *United States v. Crowder*, 141 F.3d 1202, 1208 n. 5 (D.C.Cir.1998) (en banc).

My colleagues suggest that upon retrial, the district court may wish to reconsider the admissibility of Watson's prior conviction. Although the district court is certainly free to reconsider anything it likes, there is no reason to reconsider its decision to admit this prior crimes evidence. We have repeatedly upheld the admission of such evidence in similar circumstances,[8] and the reason the court gives for regarding admissibility as a close question in this case is unpersuasive.

The court suggests that the evidence of Watson's prior crime can go only to prove "non-contested issues." Op. at 702. The court apparently adopts defendant's argument that the element of intent was uncontested in this case, because his defense was mistaken identification rather than the absence of an intent to distribute cocaine.[9] But that is precisely the argument we

rejected, en banc, in *Crowder*, where we held prior crimes evidence relevant notwithstanding a defense of mistaken identification and notwithstanding defendant's offer to stipulate that whoever did possess the drugs in question had the necessary intent. *See Crowder*, 141 F.3d at 1206; *see also Estelle v. McGuire*, 502 U.S. 62, 69–70, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense.... [The prosecution is not required] to refrain from introducing relevant evidence simply because the defense chooses not to contest the point.").

In short, the district court properly admitted the evidence of Watson's prior drug crime to prove Watson's intent with respect to the cocaine at issue in this case. Moreover, as we noted in *Crowder*, "[p]roof of an individual's intent to commit an act may itself serve as proof that the individual committed the act," and hence "other-offense evidence of intent would have probative value not just on the intent element, but also on the possession element of the offense." 141 F.3d at 1208. When this is taken together with the other evidence connecting Watson to the bag of crack cocaine, the government's evidence is sufficiently weighty to bar a conclusion that Watson was substantially prejudiced by the limited (and mitigated) error the prosecutor committed in closing argument.

### D

It may well be that in the not-too-distant future even routine criminal trials will

---

**8.** *See, e.g., United States v. Burch*, 156 F.3d 1315, 1324 (D.C.Cir.1998); *United States v. Mitchell*, 49 F.3d 769, 776 (D.C.Cir.1995); *United States v. Johnson*, 40 F.3d 436, 441 n. 3 (D.C.Cir.1994). The court notes that Watson's prior conviction was for possession with intent to distribute cocaine rather than cocaine base, and that it occurred seven years before his arrest in this case. Neither circumstance bars admission of Watson's prior conviction. *See, e.g., United States v. Tomberlin*, 130 F.3d 1318, 1319–21 (8th Cir.1997);

*United States v. Hernandez*, 84 F.3d 931, 935 (7th Cir.1996); *United States v. Broussard*, 80 F.3d 1025, 1040 (5th Cir.1996); *Mitchell*, 49 F.3d at 775–77.

**9.** I assume that the court is not arguing that the prior crimes evidence here is "remotely probative" merely because it is inadmissible to prove the issue of possession directly, since prior crimes evidence is never admissible for that purpose. *See* FED. R.CRIM. P. 404(b).

have the benefit of real-time transcripts of witness testimony. *See* Toni Locy, *Law Meets Technology in Courtroom No. 9*, WASH. POST, Aug. 21, 1997, at J1. When that day comes, disputes over testimony will be resolved by reference to transcripts rather than memories. In the meantime, however, it is inevitable that trial lawyers will suffer from innocent misrecollections. We have always relied on the self-corrective nature of the adversary system, combined with instructions from the court, to police all but the most egregious of these kinds of errors. Because I am unable to conclude that the defendant suffered substantial prejudice as a consequence of the error that occurred in this case, I respectfully dissent from the reversal of his conviction.