Opinion for the Court filed by Chief Judge GINSBURG.
Dissenting opinion filed by Circuit Judge HENDERSON.
GINSBURG, Chief Judge:
Appellant James Earle claims the district court impermissibly took judicial notice of and erroneously instructed the jury about irrelevant evidence that the prosecutor then unfairly relied upon in his closing argument. Because the prosecutor’s remarks were based upon information he knew conflicted with the record, and because the record shows Earle was prejudiced by the prosecutor’s remarks, we vacate his convictions on three of four counts and remand the case for a new trial on those counts.
I. Background
In January 2002 a federal grand jury returned a four-count indictment charging Earle with (1) possession of a firearm and ammunition by a convicted felon, 18 U.S.C. § 922(g)(1); (2) possession with intent to *1161 distribute cocaine base, 21 U.S.C. § 841(a)(1), (b)(1)(c); (3) use, carriage, and possession of a firearm during a drug trafficking offense, 18 U.S.C. § 924(c)(1); and (4) possession of a controlled substance, 21 U.S.C. § 844(a). Earle was convicted on all four counts and was sentenced to 111 months in prison. This appeal concerns counts one, two, and three.
Earle contends he was mistakenly identified and arrested as the individual three officers of the Metropolitan Police Department were pursuing on the night of December 28, 2001. Earle’s claim of mistaken identify naturally gave rise at his trial to disputed accounts of the events leading to his arrest.
The MPD officers testified they first observed Earle in an alley, where they began to follow him in their unmarked police car. According to the officers, upon realizing he was being followed, Earle ran out of the alley and down a sidewalk. Officer Batton, who was sitting in the back seat, testified that the man they were chasing pulled a gun from his waistband and threw it into an adjacent yard without breaking stride. As the officers approached a cross street, Officer Adcock stopped the car and all three officers began pursuing the individual on foot. Ad-cock testified that he managed to close to within less than ten feet of the suspect when he entered a Kwik Mart convenience store; Batton, who was behind Officers Adcock and Cristomo in the chase, put that distance at five feet. Adcock also testified that he observed the suspect, upon entering the store, “toss a clear object into the trash can.”
The police entered the store, arrested Earle, and later found 0.30 grams of cocaine base in a plastic bag in the trash can. They also found a “ziploc bag” of marijuana and $329 on Earle’s person. Batton eventually recovered a loaded gun from the yard into which the fleeing suspect had been seen to throw a gun.
At trial Earle was represented by Mr. Harry Tun. Previously, Earle had been represented by the Federal Public Defender, but on July 10, 2002 — some two days before his trial was to begin — he retained Tun, who had “represented Mr. Earle’s brother in March [2002] ... in Superior Court.” Tun immediately sought a continuance in order to prepare for Earle’s trial. The district court held a hearing on July 11, 2001 to consider Tun’s motion for a continuance. After Tun said he wanted to interview “five to six” witnesses who would testify on Earle’s behalf, the court granted the continuance.
In the event, four witnesses testified for the defense. Three of them testified Earle was inside the Kwik Mart when the fleeing suspect passed along the outside of the store. Of those three, two also testified they saw the man the police were chasing and that it was not Earle. The fourth witness testified that while he was walking to the Kwik Mart a man — not Earle — ran by him and threw something and then “ran beside the building on [sic] Kwik Stop and went in[to an] alley.” On cross-examination, three of the defense witnesses testified they had first been interviewed by Tun’s private investigator early in 2002, which was several months before Tun had entered his appearance in the case. The prosecutor questioned the witnesses at length about those interviews and in his closing arguments, suggested the interviews never took place. Suggesting the defense witnesses “got together and ... created this little story,” the prosecutor drew the jury’s attention to two facts: the date Earle retained Tun and the absence of any notes of the alleged interviews in early 2002.
The date of Tun’s retention had been injected into the case when the district *1162 court, shortly before the prosecutor's closing argument, informed the jury as follows:
The court takes judicial notice that the defendant and his family retained Mr. Tun to represent the defendant on July 10, 2002, and tha~t the family had been attempting to retain Mr. Tun for several months before that but did not have sufficient funds to do so until July 2002.
Later, in its instructions, to the jury, the district court reminded the jury that the court "took judicial notice of facts relating to the retention of Mr. Tun by the defendant and his family.~~* Also in its instructions the court directed the jurors' attention again to the absence of interview notes:
You `heard some questions during the trial with respect to whether any notes were taken by Mr. Tun or his investigator when they met with witnesses that you heard from. I advise you that there are no contemporaneous notes of those discussions.
II. Analysis
Earle claims the district court erred by taking judicial notice of the date he retained Tun and by instructing the jury about the absence of interview notes - errors he says were compounded when the district court allowed the prosecutor, over Tun's objections, to draw inferences during his closing argument that were not supported by evidence in the record. Accordingly, Earle asks this court to vacate his convictions on counts 1, 2, and 3 and to remand the case for a new trial on those counts.
A. Relevance
Earle argues that the date of Tun's retention and the absence of interview notes "say[] absolutely nothing" about whether or when counsel's investigator first interviewed the defense witnesses. In response the Government claims these facts cast doubt upon the credibility of the defense witnesses and are relevant because "credibility is always relevant," and cites United States v. Abel, 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984), for the proposition that "the jury ... has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."
The district court's decision to admit evidence as relevant is subject to review only for abuse of discretion. United States v. Smith, 232 F.3d 236, 241 (D.C.Cir.2000). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fan. R. Evin. 401.
The date Earle retained private counsel and the absence of interview notes need not be accurate indicators of whether the claimed interviews took place in order to be deemed relevant under Rule 401. The threshold for relevance, as applied to the present case, is merely that the evidence tends to make "less probable" the defense's assertion that the witnesses were interviewed early in 2002. Although, as Earle correctly points out, Tun may well have taken preparatory measures long be-fdre he was formally retained, we cannot say the district court abused its discretion by allowing the jurors to consider the evidence to which Earle now objects.
Earle next argues the date of Tun's retention and the absence of interview notes should have been excluded under *1163 Federal Rule of Evidence 403 because it was "highly likely" the jurors would be "confused and misled" by that evidence. The court's statement of judicial notice and its jury instructions, however, were not themselves confusing or misleading. In fact, Earle's objection has more to do with the inferences the prosecutor drew from the evidence than it does the admissibility of that evidence. Accordingly, we find the district court did not abuse its discretion in admitting the evidence after having weighed its "probative value" against the danger it raised of "unfair prejudice, confusion of the issues or misleading the jury." United States v. Long, 328 F.3d 655, 662 (D.C.Cir.2003); see also FED. R. EVID. 403.
B. Impermissible inference
Even evidence deemed relevant under Rule 401 and not prejudicial under Rule 403 may not be used as a springboard to propound an impermissible inference. Cf. United States v. Edmonds, 69 F.3d 1172, 1176 (D.C.Cir.1995) (although evidence admitted was "`damaging,' there was little danger of unfair prejudice [where] prosecutor never argued an impermissible inference and did not emphasize the testimony"). Earle argues the prosecutor did just that in his closing argument by questioning Tun's involvement in the case prior to his retention in July 2002, despite the prosecutor's knowledge of Tun's contrary representations to the court. The Government responds that there is evidence in the record contradicting Tun's representation about both the date of his retention and the existence of the interview notes, namely, Tun's statement in his motion for continuance that "there are eyewitnesses who are essential to this case [who] have yet to be interviewed"; therefore, according to the Government, the prosecutor's closing argument was "firm but fair advocacy ..., not prosecutorial error."
 For a prosecutor's statements in closing argument to warrant a new trial, they must entail a serious error that is prejudicial to the defendant. United States v. Watson, 171 F.3d 695, 699 (D.C.Cir.1999). It is a serious error "for counsel to make statements in closing argument unsupported by evidence, to misstate admitted evidence, or to misquote a witness' testimony." Id.; see also United States v. Blueford, 312 F.3d 962, 968 (9th Cir.2002) (error where prosecution "propound[s] inferences that it knows to be false, or has very strong reason to doubt").
Here, Earle objects to the following remarks in the prosecutor's closing argument:
[Prosecutor]: Remember the last thing the judge did before we started here? He took judicial notice of a fact. And the fact that he took judicial notice of was that Mr. Earle and his family did not retain Mr. Tun until July the 10th of 2002. They had been trying to raise the money before for several months. Apply your common sense here. Does it make sense to you that an investigator would go out on behalf of an attorney who had not been retained, who had not been paid?
Mr. Tun: Objection. That is not [the] judicial notice.
The Court: The objection is overruled. I think the way it is phrased is admissible. Go ahead.
[Prosecutor]: Does it make sense to you that an investigator on behalf of a defense attorney who had not been retained, who had not been paid any money, is going to go out and start investigating a case when somebody else represents the defendant?
Mr. Tun: Objection. That's not in evidence.
The Court: Overruled.
*1164 [Prosecutor]: I submit to you it makes no sense. The defense witnesses, I submit to you, got together and they created this little story. The only problem is they forgot to apply a little bit of common sense. Why would a defense investigator go out and talk to them in January? I submit to you there’s no good reason other than the fact that they weren’t telling you the truth....
During his rebuttal, the prosecutor again questioned Tun’s involvement in the case prior to the date of his retention:
Mr. Tun would have you believe that out of the goodness of his heart, for the passion of his work, he was involved, he was doing this stuff for free.... To suggest that Mr. Tun sent out an investigator when he wasn’t retained I submit to you just doesn’t make sense. And your common sense tells you that, I submit to you. The statement that the judge read to you was that for several months the family had been trying to retain Mr. Tun. I ask you, is several months one? Maybe two? Maybe three? But is it seven? The judge also told you, remember one of the witnesses, I think it was two of the witnesses said that when the investigator was talking to them, the investigator was taking notes? I believe the judge advised you there are no notes.
The prosecutor made these statements to the jury despite having heard Tun’s representations to the district court — representations neither the court nor the prosecutor ever questioned — that before he was formally retained he had visited Earle in jail in connection with this case on “at least five occasions] from [the] beginning of February ... if not earlier.” Tun further volunteered that the jail’s visitor log would confirm those visits. There is not the slightest suggestion in the record that the visits did not take place or that the prosecutor ever challenged the accuracy of Tun’s representations in any way, as Government counsel on this appeal acknowledged at oral argument. Tun also explained to the district court and to the prosecutor that his “normal practice with regard to interviewing witnesses [was] not [to] take any notes.” The district court did not question Tun’s practice; on the contrary, it accepted his representation at face value. See 9/6/02 am Tr. at 9 (“You don’t have to explain why you don’t take notes, Mr. Tun. That’s not anybody’s business.”). And the prosecutor likewise stated, “If Mr. Tun is representing to the court that there are no notes, then I’ll accept that.”
The Government claims the inferences proposed by the prosecutor were permissible because Tun’s pre-trial representations to the district court contradict his objection at trial to judicial notice of the date of his retention. Here the Government is referring to Tun’s July 10, 2002 motion for a continuance, in which he stated:
It is undersigned counsel’s understanding that there are eyewitnesses who are essential to this case and that they have yet to be subpoenaed or interviewed.... Undersigned counsel will not be prepared to try this matter on July 12, 2002 due to his inability to interview, investigate and subpoena appropriate witnesses for defendant.
There is no contradiction here. As Earle correctly points out, Tun was merely stating that he himself had not yet interviewed the witnesses. His request for a continuance says nothing about whether his investigator had done so. Nor is there any reason to doubt that an attorney would want to interview his witnesses personally before putting them on the witness stand even though his investigator had already spoken to them some months before.
*1165 Based upon the record in this case, the prosecutor clearly had every reason to doubt, and no good reason to support, the inferences he propounded to the jury in his closing arguments. We therefore hold the district court erred by allowing the prosecutor to make those statements over Tun’s repeated objection.
Despite that error, we must still determine whether Earle “suffered sufficient prejudice” to warrant a new trial. Watson, 171 F.3d at 700. We look specifically at the following three factors: (1) “the severity of the prosecutor’s misconduct”; (2) “the measures adopted to cure the misconduct”; and (3) “the certainty of conviction absent the improper remarks.” Id., quoting United States v. Gartmon, 146 F.3d 1015, 1026 (D.C.Cir.1998).
The first and second enumerated factors are easily applied to the facts of this case. The prosecutor’s closing argument, by suggesting Tun’s investigator had not interviewed defense witnesses early in 2002, contrary to the testimony of three defense witnesses, called into question the credibility not only of those witnesses but that of Tun himself; he put Tun in the position of having to defend his credibility and to argue to the jury — as he did at some length — that he had worked on the case before he was formally retained. Thus did the prosecutor make this collateral issue central to the defendant’s case. And his doing so may well have affected the outcome, for the jury sent a note to the court asking: “How did the investigator locate the witnesses?” We cannot imagine that question would have arisen but for the prosecutor’s suggestion that Tun, the investigator’s employer, had not been involved in the case when the witnesses testified the investigator had interviewed them.
With respect to “the measures adopted to cure the misconduct,” there simply was none. On the contrary, the district court overruled Tun’s several objections to the prosecutor’s impermissible comments.
Whether this is otherwise a close enough case for these errors to undermine our confidence in the verdict is itself a nice question. On the one hand, two police officers testified that they saw Earle throw a gun into a yard while he was running away from them. And three officers testified that they had seen Earle enter the Kwik Mart. On the other hand, three defense witnesses testified that they saw the individual who was running from the police and that it was not Earle. These conflicting accounts could have left a reasonable jury with doubts about the identity of the fleeing suspect. Indeed, the jurors in this case appear to have harbored such doubts: They submitted two questions to the district court specifically and pointedly directed to the question of identity. They asked: “Were there any fingerprints on the narcotics bag?” (referring to the bag found inside the convenience store); and “How does no fingerprints play in this case (gun)?”
Finally, as Government counsel again acknowledged at oral argument, there was an “objective physical fact” tending both to favor Earle’s description of events and to draw into question that of the Government, namely, the undisputed presence of Earle’s girlfriend at the Kwik Mart at the time of his arrest. She testified that she and Earle had been out for dinner and had stopped at the Kwik Mart on their way home together. If Earle was in the Kwik Mart only because he was seeking to evade police officers who had been chasing him through the streets, then it seems passing strange that his girlfriend also happened to be at the store when he was arrested. Yet the Government did nothing at trial to cast doubt upon her testimony to that effect. On the contrary, one officer testified: “I remember a female out there— I *1166 think the female is the one we gave the prisoner’s property to.”
For the foregoing reasons, we are left with “grave doubt” as to whether the prosecutor’s impermissible inferences about Tun’s involvement before his formal retention did not affect the jury’s verdict. Watson, 171 F.3d at 700. Accordingly, we are constrained to hold the error was not harmless.
III. Conclusion
The judgment against Earle on Counts 1, 2, and 3 is vacated and the case is remanded for a new trial with respect thereto.

So ordered.

 As required by Federal Rule of Evidence 201(g) of a court taking judicial notice of adjudicative facts in a criminal case, the district court also instructed the jury they were not required to "regard those facts as proven evidence."