Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued February 19, 2004        Decided July 23, 2004

No. 02-3110

UNITED STATES OF AMERICA,
APPELLEE

v.

JAMES EARLE,
APPELLANT

————

Appeal from the United States District Court
for the District of Columbia
(No. 02cr00034–01)

————

*Lisa B. Wright*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender. *Neil H. Jaffee*, Assistant Federal Public Defender, entered an appearance.

*Thomas S. Rees*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Roscoe C. Howard,*

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Jr.*, U.S. Attorney, *John R. Fisher*, *Roy W. McLeese III*, and *Arvind K. Lal*, Assistant U.S. Attorneys.

Before: GINSBURG, *Chief Judge*, HENDERSON, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

GINSBURG, *Chief Judge*: Appellant James Earle claims the district court impermissibly took judicial notice of and erroneously instructed the jury about irrelevant evidence that the prosecutor then unfairly relied upon in his closing argument. Because the prosecutor's remarks were based upon information he knew conflicted with the record, and because the record shows Earle was prejudiced by the prosecutor's remarks, we vacate his convictions on three of four counts and remand the case for a new trial on those counts.

## I. Background

In January 2002 a federal grand jury returned a four-count indictment charging Earle with (1) possession of a firearm and ammunition by a convicted felon, 18 U.S.C. § 922(g)(1); (2) possession with intent to distribute cocaine base, 21 U.S.C. § 841(a)(1), (b)(1)(c); (3) use, carriage, and possession of a firearm during a drug trafficking offense, 18 U.S.C. § 924(c)(1); and (4) possession of a controlled substance, 21 U.S.C. § 844(a). Earle was convicted on all four counts and was sentenced to 111 months in prison. This appeal concerns counts one, two, and three.

Earle contends he was mistakenly identified and arrested as the individual three officers of the Metropolitan Police Department were pursuing on the night of December 28, 2001. Earle's claim of mistaken identify naturally gave rise at his trial to disputed accounts of the events leading to his arrest.

The MPD officers testified they first observed Earle in an alley, where they began to follow him in their unmarked police car. According to the officers, upon realizing he was

being followed, Earle ran out of the alley and down a sidewalk. Officer Batton, who was sitting in the back seat, testified that the man they were chasing pulled a gun from his waistband and threw it into an adjacent yard without breaking stride. As the officers approached a cross street, Officer Adcock stopped the car and all three officers began pursuing the individual on foot. Adcock testified that he managed to close to within less than ten feet of the suspect when he entered a Kwik Mart convenience store; Batton, who was behind Officers Adcock and Cristomo in the chase, put that distance at five feet. Adcock also testified that he observed the suspect, upon entering the store, "toss a clear object into the trash can."

The police entered the store, arrested Earle, and later found 0.30 grams of cocaine base in a plastic bag in the trash can. They also found a "ziploc bag" of marijuana and $329 on Earle's person. Batton eventually recovered a loaded gun from the yard into which the fleeing suspect had been seen to throw a gun.

At trial Earle was represented by Mr. Harry Tun. Previously, Earle had been represented by the Federal Public Defender, but on July 10, 2002 — some two days before his trial was to begin — he retained Tun, who had "represented Mr. Earle's brother in March [2002] . . . in Superior Court." Tun immediately sought a continuance in order to prepare for Earle's trial. The district court held a hearing on July 11, 2001 to consider Tun's motion for a continuance. After Tun said he wanted to interview "five to six" witnesses who would testify on Earle's behalf, the court granted the continuance.

In the event, four witnesses testified for the defense. Three of them testified Earle was inside the Kwik Mart when the fleeing suspect passed along the outside of the store. Of those three, two also testified they saw the man the police were chasing and that it was not Earle. The fourth witness testified that while he was walking to the Kwik Mart a man — not Earle — ran by him and threw something and then "ran beside the building on [sic] Kwik Stop and went in[to an] alley." On cross-examination, three of the defense

witnesses testified they had first been interviewed by Tun's private investigator early in 2002, which was several months before Tun had entered his appearance in the case. The prosecutor questioned the witnesses at length about those interviews and in his closing arguments, suggested the interviews never took place. Suggesting the defense witnesses "got together and . . . created this little story," the prosecutor drew the jury's attention to two facts: the date Earle retained Tun and the absence of any notes of the alleged interviews in early 2002.

The date of Tun's retention had been injected into the case when the district court, shortly before the prosecutor's closing argument, informed the jury as follows:

> The court takes judicial notice that the defendant and his family retained Mr. Tun to represent the defendant on July 10, 2002, and that the family had been attempting to retain Mr. Tun for several months before that but did not have sufficient funds to do so until July 2002.

Later, in its instructions to the jury, the district court reminded the jury that the court "took judicial notice of facts relating to the retention of Mr. Tun by the defendant and his family."* Also in its instructions the court directed the jurors' attention again to the absence of interview notes:

> You heard some questions during the trial with respect to whether any notes were taken by Mr. Tun or his investigator when they met with witnesses that you heard from. I advise you that there are no contemporaneous notes of those discussions.

## II. Analysis

Earle claims the district court erred by taking judicial notice of the date he retained Tun and by instructing the jury about the absence of interview notes — errors he says were

---

* As required by Federal Rule of Evidence 201(g) of a court taking judicial notice of adjudicative facts in a criminal case, the district court also instructed the jury they were not required to "regard those facts as proven evidence."

compounded when the district court allowed the prosecutor, over Tun's objections, to draw inferences during his closing argument that were not supported by evidence in the record. Accordingly, Earle asks this court to vacate his convictions on counts 1, 2, and 3 and to remand the case for a new trial on those counts.

A. Relevance

Earle argues that the date of Tun's retention and the absence of interview notes "say[ ] absolutely nothing" about whether or when counsel's investigator first interviewed the defense witnesses. In response the Government claims these facts cast doubt upon the credibility of the defense witnesses and are relevant because "credibility is always relevant," and cites *United States v. Abel*, 469 U.S. 45, 52 (1984), for the proposition that "the jury . . . has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."

The district court's decision to admit evidence as relevant is subject to review only for abuse of discretion. *United States v. Smith*, 232 F.3d 236, 241 (D.C. Cir. 2000). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401.

The date Earle retained private counsel and the absence of interview notes need not be accurate indicators of whether the claimed interviews took place in order to be deemed relevant under Rule 401. The threshold for relevance, as applied to the present case, is merely that the evidence tends to make "less probable" the defense's assertion that the witnesses were interviewed early in 2002. Although, as Earle correctly points out, Tun may well have taken preparatory measures long before he was formally retained, we cannot say the district court abused its discretion by allowing the jurors to consider the evidence to which Earle now objects.

Earle next argues the date of Tun's retention and the absence of interview notes should have been excluded under

Federal Rule of Evidence 403 because it was "highly likely" the jurors would be "confused and misled" by that evidence. The court's statement of judicial notice and its jury instructions, however, were not themselves confusing or misleading. In fact, Earle's objection has more to do with the inferences the prosecutor drew from the evidence than it does the admissibility of that evidence. Accordingly, we find the district court did not abuse its discretion in admitting the evidence after having weighed its "probative value" against the danger it raised of "unfair prejudice, confusion of the issues or misleading the jury." *United States v. Long*, 328 F.3d 655, 662 (D.C. Cir. 2003); *see also* FED. R. EVID. 403.

B.   Impermissible inference

Even evidence deemed relevant under Rule 401 and not prejudicial under Rule 403 may not be used as a springboard to propound an impermissible inference. *Cf. United States v. Edmonds*, 69 F.3d 1172, 1176 (D.C. Cir. 1995) (although evidence admitted was " 'damaging,' . . . there was little danger of unfair prejudice [where] prosecutor never argued an impermissible inference and did not emphasize the testimony"). Earle argues the prosecutor did just that in his closing argument by questioning Tun's involvement in the case prior to his retention in July 2002, despite the prosecutor's knowledge of Tun's contrary representations to the court. The Government responds that there is evidence in the record contradicting Tun's representation about both the date of his retention and the existence of the interview notes, namely, Tun's statement in his motion for continuance that "there are eyewitnesses who are essential to this case [who] have yet to be . . . interviewed"; therefore, according to the Government, the prosecutor's closing argument was "firm but fair advocacy . . ., not prosecutorial error."

For a prosecutor's statements in closing argument to warrant a new trial, they must entail a serious error that is prejudicial to the defendant. *United States v. Watson*, 171 F.3d 695, 699 (D.C. Cir. 1999). It is a serious error "for counsel to make statements in closing argument unsupported by evidence, to misstate admitted evidence, or to misquote a

witness' testimony." *Id.*; *see also United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002) (error where prosecution "propound[s] inferences that it knows to be false, or has very strong reason to doubt").

Here, Earle objects to the following remarks in the prosecutor's closing argument:

> [Prosecutor]: Remember the last thing the judge did before we started here? He took judicial notice of a fact. And the fact that he took judicial notice of was that Mr. Earle and his family did not retain Mr. Tun until July the 10th of 2002. They had been trying to raise the money before for several months. Apply your common sense here. Does it make sense to you that an investigator would go out on behalf of an attorney who had not been retained, who had not been paid?
>
> Mr. Tun: Objection. That is not [the] judicial notice.
>
> The Court: The objection is overruled. I think the way it is phrased is admissible. Go ahead.
>
> [Prosecutor]: Does it make sense to you that an investigator on behalf of a defense attorney who had not been retained, who had not been paid any money, is going to go out and start investigating a case when somebody else represents the defendant?
>
> Mr. Tun: Objection. That's not in evidence.
>
> The Court: Overruled.
>
> [Prosecutor]: I submit to you it makes no sense. The defense witnesses, I submit to you, got together and they created this little story. The only problem is they forgot to apply a little bit of common sense. Why would a defense investigator go out and talk to them in January? I submit to you there's no good reason other than the fact that they weren't telling you the truth. . . .

During his rebuttal, the prosecutor again questioned Tun's involvement in the case prior to the date of his retention:

> Mr. Tun would have you believe that out of the goodness of his heart, for the passion of his work, he was involved,

> he was doing this stuff for free . . . . To suggest that Mr. Tun sent out an investigator when he wasn't retained I submit to you just doesn't make sense. And your common sense tells you that, I submit to you. The statement that the judge read to you was that for several months the family had been trying to retain Mr. Tun. I ask you, is several months one? Maybe two? Maybe three? But is it seven? The judge also told you, remember one of the witnesses, I think it was two of the witnesses said that when the investigator was talking to them, the investigator was taking notes? I believe the judge advised you there are no notes.

The prosecutor made these statements to the jury despite having heard Tun's representations to the district court—representations neither the court nor the prosecutor ever questioned—that before he was formally retained he had visited Earle in jail in connection with this case on "at least five occasion[s] from [the] beginning of February . . . if not earlier." Tun further volunteered that the jail's visitor log would confirm those visits. There is not the slightest suggestion in the record that the visits did not take place or that the prosecutor ever challenged the accuracy of Tun's representations in any way, as Government counsel on this appeal acknowledged at oral argument. Tun also explained to the district court and to the prosecutor that his "normal practice with regard to interviewing witnesses [was] not [to] take any notes." The district court did not question Tun's practice; on the contrary, it accepted his representation at face value. *See* 9/6/02 am Tr. at 9 ("You don't have to explain why you don't take notes, Mr. Tun. That's not anybody's business."). And the prosecutor likewise stated, "If Mr. Tun is representing to the court that there are no notes, then I'll accept that."

The Government claims the inferences proposed by the prosecutor were permissible because Tun's pre-trial representations to the district court contradict his objection at trial to judicial notice of the date of his retention. Here the Government is referring to Tun's July 10, 2002 motion for a continuance, in which he stated:

> It is undersigned counsel's understanding that there are eyewitnesses who are essential to this case and that they have yet to be subpoenaed or interviewed.... Undersigned counsel will not be prepared to try this matter on July 12, 2002 due to his inability to interview, investigate and subpoena appropriate witnesses for defendant.

There is no contradiction here. As Earle correctly points out, Tun was merely stating that he himself had not yet interviewed the witnesses. His request for a continuance says nothing about whether his investigator had done so. Nor is there any reason to doubt that an attorney would want to interview his witnesses personally before putting them on the witness stand even though his investigator had already spoken to them some months before.

Based upon the record in this case, the prosecutor clearly had every reason to doubt, and no good reason to support, the inferences he propounded to the jury in his closing arguments. We therefore hold the district court erred by allowing the prosecutor to make those statements over Tun's repeated objection.

Despite that error, we must still determine whether Earle "suffered sufficient prejudice" to warrant a new trial. *Watson*, 171 F.3d at 700. We look specifically at the following three factors: (1) "the severity of the prosecutor's misconduct"; (2) "the measures adopted to cure the misconduct"; and (3) "the certainty of conviction absent the improper remarks." *Id.,* quoting *United States v. Gartmon*, 146 F.3d 1015, 1026 (D.C. Cir. 1998).

The first and second enumerated factors are easily applied to the facts of this case. The prosecutor's closing argument, by suggesting Tun's investigator had not interviewed defense witnesses early in 2002, contrary to the testimony of three defense witnesses, called into question the credibility not only of those witnesses but that of Tun himself; he put Tun in the position of having to defend his credibility and to argue to the jury — as he did at some length — that he had worked on the case before he was formally retained. Thus did the prosecutor make this collateral issue central to the defendant's case.

And his doing so may well have affected the outcome, for the jury sent a note to the court asking: "How did the investigator locate the witnesses?" We cannot imagine that question would have arisen but for the prosecutor's suggestion that Tun, the investigator's employer, had not been involved in the case when the witnesses testified the investigator had interviewed them.

With respect to "the measures adopted to cure the misconduct," there simply was none. On the contrary, the district court overruled Tun's several objections to the prosecutor's impermissible comments.

Whether this is otherwise a close enough case for these errors to undermine our confidence in the verdict is itself a nice question. On the one hand, two police officers testified that they saw Earle throw a gun into a yard while he was running away from them. And three officers testified that they had seen Earle enter the Kwik Mart. On the other hand, three defense witnesses testified that they saw the individual who was running from the police and that it was not Earle. These conflicting accounts could have left a reasonable jury with doubts about the identity of the fleeing suspect. Indeed, the jurors in this case appear to have harbored such doubts: They submitted two questions to the district court specifically and pointedly directed to the question of identity. They asked: "Were there any fingerprints on the narcotics bag?" (referring to the bag found inside the convenience store); and "How does no fingerprints play in this case (gun)?"

Finally, as Government counsel again acknowledged at oral argument, there was an "objective physical fact" tending both to favor Earle's description of events and to draw into question that of the Government, namely, the undisputed presence of Earle's girlfriend at the Kwik Mart at the time of his arrest. She testified that she and Earle had been out for dinner and had stopped at the Kwik Mart on their way home together. If Earle was in the Kwik Mart only because he was seeking to evade police officers who had been chasing him through the streets, then it seems passing strange that

his girlfriend also happened to be at the store when he was arrested. Yet the Government did nothing at trial to cast doubt upon her testimony to that effect. On the contrary, one officer testified: "I remember a female out there.... I think the female is the one we gave the prisoner's property to."

For the foregoing reasons, we are left with "grave doubt" as to whether the prosecutor's impermissible inferences about Tun's involvement before his formal retention did not affect the jury's verdict. *Watson*, 171 F.3d at 700. Accordingly, we are constrained to hold the error was not harmless.

### III.   Conclusion

The judgment against Earle on Counts 1, 2, and 3 is vacated and the case is remanded for a new trial with respect thereto.

*So ordered.*

1

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting:

Because I believe the prosecutor did nothing impermissible, I dissent from the majority opinion reversing James Earle's conviction. To clarify my reasons, I will expand on the majority's bare-bones factual recitation.

Three days after his arrest, Earle made his initial court appearance on December 31, 2001, represented by the Federal Public Defender's Office. On June 11, 2002 the district court scheduled the trial for July 12, 2002. On the eve of the trial date new developments caught the court, the prosecutor and Earle's own public defender by surprise. On July 10, two days before the trial was to begin, lawyer Harry Tun filed a motion for continuance, stating he had been retained by Earle's family just that day and needed a continuance to interview five or six newly-discovered witnesses. At a hearing the following day, Tun informed the court that Earle's family had contacted Tun immediately after Earle's arrest but at the time had been unable to pay his fee, having just finished paying him for successfully representing Earle's brother, Domingo Stephenson, in a criminal trial "involving [a] similar situation." 7/11 Tr. at 3. But on the previous day, he explained, "they were able to come up with [a] partial amount of [the] attorney's fee" and "signed a promissory note to pay the rest of it." *Id.* at 4. Tun told the court it was his "understanding" there were "five to six witnesses that need to be interviewed and who will be able to testify on behalf of Mr. Earle during his trial and exculpate his involvement in this case." 7/11 Tr. at 3. Earle's public defender informed the court he "didn't have any knowledge" of the witnesses of whom Tun spoke. *Id.* at 4. To accommodate Tun, the court rescheduled the trial for September 3, 2002, although the "11th hour" change would "wreak[ ] havoc on the schedules of many people," *id.* at 10, including the prosecutor who was not available to try the case on September 3 and would therefore need to find a replacement.

The trial began on September 3 as scheduled, with a substitute prosecutor. During the government's case, Officers Adcock, Batton and Crisostomo testified that, while pursuing Earle the night of the arrest, they observed him withdraw a firearm from his waistband and throw it into a

nearby yard and, after arriving at the "Kwik Mart" where he was arrested, deposit in a trash can a plastic baggie that turned out to contain 11 smaller baggies of cocaine base. When they arrested him, the officers found a bag of marijuana and $329 in cash on his person.

The defense offered the testimony of four witnesses who said they saw a man other than Earle running from the police the night of the incident: George Lewis, Derrick Vaughn, Pedram Roshan and Earle's girlfriend, Anna Baylor.

George Lewis testified he had known Earle for ten years but did not know his family. On cross examination he stated Tun's investigator served him with a subpoena about one month before trial and spoke with him at that time but took no notes. According to Lewis, before that time he had not "spoken to Mr. Tun or anybody associated with Mr. Tun about th[e] case." 9/5 Tr. at 109. He testified that, a couple of days after talking with Tun's investigator, he met with Tun, who was writing in a notebook "[m]ost of the time" during the interview. *Id.* at 110. Lewis also admitted on cross that, contrary to his direct testimony that he did not know Earle's family, he *did* know Earle's brother, Domingo Stephenson, on whose behalf he had testified at the criminal trial that Tun mentioned at the July 11 hearing and that at that trial he had, in similar fashion, falsely testified that he did not know Stephenson's family.

Derrick Vaughn testified he knew Earle because they played basketball together. On cross-examination, Vaughn testified he met with Tun's investigator in January 2002. He stated initially that she "was writing things down" during the interview, then clarified that she "didn't write everything [he] told her"—specifically, that she "didn't write down what [he] said, what [he] told her"—and finally that he was "not sure" whether she wrote down anything. 9/5 Tr. at 175–76. Vaughn stated he met with Tun a few weeks before trial but could not recall whether Tun took any notes during the interviews. *Id.* at 175.

Pedram Roshan testified that he also knew Earle from playing basketball. On cross-examination he stated he had

met with Tun's investigator around the third week of January 2002 and that she was writing things down while he was "telling her [his] story." 9/5 Tr. at 201.

Anna Baylor testified that she was interviewed by Tun's investigator a few weeks after Earle's arrest and by Tun twice, once while "[i]t was still cold outside," 9/5 Tr. at 244. She could not recall whether either Tun or the investigator took notes.

At the end of the court session on September 5, the district court, at the government's urging, asked Tun to check his files to see if he had any notes, taken either by himself or his investigator, of interviews with the witnesses. The following morning Tun reported that he had none. The government then requested that the court instruct the jury there were no such notes.

At the close of the defense case, the government requested that the court take judicial notice of Tun's representation, contained in the continuance motion, that the "[d]efendant and his family retained undersigned counsel to represent defendant on July 10, 2002" and that the court so instruct the jury. Tun opposed the motion, although he did not, indeed could not, dispute the accuracy of the requested instruction. When the court informed counsel it would advise the jury that there were "no contemporaneous notes" of interviews by Tun or his investigator, Tun agreed to the instruction. As the majority notes, the court delivered both instructions to the jury.

I agree with the majority that the court did not err in taking judicial notice of the date Tun was retained as defense counsel or in advising the jury that there were no notes of defense interviews with the witnesses. As the majority notes, the challenged jury instructions were neither confusing nor misleading and the facts they relayed were relevant because they undercut the defense witnesses' credibility. I cannot agree, however, that it was in any way improper for the prosecutor to suggest to the jurors the following unremarkable inferences from the instructions: that it was unlikely Tun paid his investigator to interview the witnesses in January

4

2002, some 6 months before Tun agreed to represent Earle on July 10 when Earle's family came up with a down payment, that the notes Roshan (and initially Vaughn) testified were taken did not exist and that just maybe, then, the witnesses were lying about the interviews. The prosecutor's argument was wholly proper and there is no ground to reverse. The majority's "rationale" for its contrary disposition is bewildering.

The majority finds the government's suggestion in closing argument that Tun's investigator did not interview the witnesses in early January 2002 is impermissible because it is inconsistent with the evidence or at least with Tun's assertions to the court. The inconsistency, however, lies with the defense. Contrary to the majority's view, the testimony of the three defense witnesses (and Tun's own claims during trial) that Tun's investigator interviewed them in January 2002 flatly contradicts Tun's blanket, unqualified statement contained in the July 10, 2002 continuance motion that the same witnesses "have yet to be subpoenaed or interviewed" and his separate assertion, made in the same motion, that "counsel will not be prepared to try this matter on July 12, 2002 due to his inability to interview, *investigate* and subpoena appropriate witnesses for defendant" (emphasis added). The unambiguous meaning of the quoted language is that, as of the motion's date, the newly-emerged defense witnesses had not been interviewed by either Tun or his investigator.

To bolster its position, the majority points, curiously, to Tun's practice of not taking notes when interviewing clients, which I can only suppose is intended to explain the discrepancy between the defense testimony that *the investigator* took notes when *she* interviewed them and the fact the notes do not exist. How Tun's personal notetaking practices are relevant to the issue eludes me. Equally inexplicable is the majority's reliance on Tun's declarations about *his own* visits with *Earle* to support the view that Tun must therefore have paid *the investigator* to interview *the witnesses*.

I also disagree that the prosecutor's statement necessarily prejudiced Earle—although, given that the government's ar-

gument was permissible, the issue need not be reached. *See United States v. Edelin*, 996 F.2d 1238, 1243 (D.C. Cir. 1993) (in determining whether to reverse convictions on account of misstatement in closing argument, "the court has required a finding both that the prosecutor's actions were improper and that they substantially prejudiced the jury." (citing *United States v. North*, 910 F.2d 843, 897 (D.C. Cir. 1990))). The unimpeached testimony of the police officers consistently and unequivocally identified Earle as the fleeing man who discarded the firearm and the bags of cocaine and from whom, at the time of his arrest, the police recovered a bag of marijuana and a large sum of cash. By contrast, the defense testimony was at times tentative, grudging, inconsistent or plainly false. For example, on cross-examination Lewis acknowledged that he testified incorrectly on direct that he was unfamiliar with Earle's family and admitted he had similarly mistestified at Earle's brother's trial; as noted above, Vaughn equivocated over whether the investigator had taken notes during his interview; when asked if he had been convicted in Maryland of possessing marijuana and cocaine, Roshan responded "I don't believe I was really convicted. I served community service," 9/11 Tr. at 195–96; and Baylor testified erratically or evasively about when she was first interviewed by Tun, whether the shopping mall she said she and Earle had visited the night of the arrest had only recently opened at the time, what route she took from the mall to the Kwik Mart and even whether Earle was her "boyfriend"—in fact she testified she did not even know where Earle lived. And it is not surprising that the jury sent a note asking how the investigator located the witnesses, maj. op. at 10, given that Roshan had testified that Earle did not know Roshan's last name yet the investigator had no problem locating and identifying Roshan on a public basketball court. Further, if the jurors during deliberations "harbored doubts about the identity of the fleeing suspect," as the majority infers from their question about fingerprints, maj. op. at 10, the doubts were not resolved as a result of the allegedly improper argument, which had already occurred—although resolved they were by the next morning's verdict. As for Baylor's presence at the

6

Kwik Mart, her proximity to her "boyfriend" was unremarkable and—along with the presence of her car—could well account for Earle's decision to flee there. Finally, the majority suggests that the prosecutor made "central" the "collateral" issue of Tun's performance as a lawyer in this case. But it was Tun who personalized the issue. He spoke at length in his closing (filling several pages of the transcript) about what a lawyer "who cares about his client" would do under the circumstances, 9/16 Tr. at 97, and what he and his investigator in fact did before trial.

In sum, the prosecutor's argument was simple, straightforward and entirely logical. He asked the jurors to consider whether the defense witnesses' testimony was credible, that is, was it likely, as the witnesses testified, that defense counsel would have sent his paid investigator to interview witnesses 6 months before he agreed to represent Earle and that during the interviews the investigator would have taken notes that did not exist. The jurors apparently reached the same conclusion as the prosecutor.